United States Court of Appeals,

Eleventh Circuit.

No. 94-2629.

Collene MAYNARD, Plaintiff-Appellee,

v.

Robert WILLIAMS, John Awad, Dr., Defendants-Appellants.

Jan. 12, 1996.

Appeal from the United States District Court for the Northern District of Florida. (No. 92-40279MMP), Maurice Mitchell Paul, Chief Judge.

Before COX, Circuit Judge, and CLARK and WOOD[*], Jr., Senior Circuit Judges.

HARLINGTON WOOD, Jr., Senior Circuit Judge:

James Towey, the Secretary[1] of the Florida Department of Health and Rehabilitative Services, and John Awad, the District Administrator of District II of the Department of Health and Rehabilitative Services, (together, "HRS") appeal the district court's grant of summary judgment in favor of Tanja Mathis. Mathis and two others brought suit under 42 U.S.C. § 1983 after HRS imposed a freeze on the provision of child care services to recipients of Aid to Families with Dependent Children ("AFDC") who were, or who wished to be, engaged in an approved education or training program as detailed in Title IV-F of the Social Security

---

[*]Honorable Harlington Wood, Jr., Senior U.S. Circuit Judge for the Seventh Circuit, sitting by designation.

[1]James Towey replaced Robert Williams as the Secretary of the Florida Department of Health and Rehabilitative Services during the pendency of this case. Pursuant to Rule 43(c)(1) of the Federal Rules of Appellate Procedure, Mr. Towey automatically replaced Mr. Williams as a party. Since this appeal was filed under the name of Mr. Williams, however, the original caption of the case has been retained in order to avoid confusion.

Act, 42 U.S.C. § 681, *et seq.* Mathis alleged that HRS was required to provide child care services to all such AFDC recipients pursuant to 42 U.S.C. § 602(g), as amended by the Family Support Act of 1988. HRS argues that summary judgment was improperly granted because (1) no private right of action exists under § 1983 to enforce § 602(g)'s child care provisions; (2) the plaintiffs lacked standing because they had not been officially approved to participate in an education or training program; and (3) § 602(g) does not, on the merits, require states to provide child care to all AFDC recipients who are, or who seek to be, enrolled in an approved education or training program. We conclude that no private right of action exists here under § 1983, and we reverse the district court's grant of summary judgment in favor of Mathis.

## I. BACKGROUND

The Aid to Families with Dependent Children program, authorized by Title IV-A of the Social Security Act, is a cooperative federal-state program which provides a variety of financial assistance to needy families with minor children. 42 U.S.C. § 601 *et seq.* Participation in the program is voluntary, but participating states, such as Florida, must comply with the requirements imposed by the Social Security Act and with the regulations issued by the Secretary of Health and Human Services ("Secretary"). *Turner v. Ledbetter,* 906 F.2d 606, 609 (11th Cir.1990), *cert. denied,* 500 U.S. 928, 111 S.Ct. 2041, 114 L.Ed.2d 125 (1991).

One such requirement mandates the creation and operation of a "job opportunities and basic skills training program" ("JOBS

program"). 42 U.S.C. § 681, *et seq.* ("Title IV-F"). The JOBS program is designed to provide a bootstrap to families receiving AFDC assistance; through education and training, the JOBS program seeks to help recipients avoid long-term welfare dependence. 42 U.S.C. § 681. Florida's JOBS program is entitled "Project Independence."

Recognizing that the high cost of child care services prohibits many parents or guardians of minor children from participating in the JOBS program, Congress amended Title IV of the Social Security Act in an effort to make the JOBS program more available to those individuals who, arguably, need it most. Therefore, pursuant to the Family Support Act of 1988, persons participating in a JOBS program are now eligible to receive child care services. 42 U.S.C. § 602(g). Section 602(g) provides:

> Each State agency must guarantee child care in accordance with subparagraph (B)—
>
> ....
>
> (II) for each individual participating in an education and training activity (including participation in a program that meets the requirements of subsection (a)(19) of this section and part F of this subchapter) if the State agency approves the activity and determines that the individual is satisfactorily participating in the activity.

42 U.S.C. § 602(g)(1)(A)(i).[2]

---

[2]Section 602(g) further provides:

> The State agency may guarantee child care by—
>
>> (i) providing such care directly;
>>
>> (ii) arranging the care through providers by use of purchase of service contracts, or vouchers;
>>
>> (iii) providing cash or vouchers in advance to the caretaker relative in the family;

This lawsuit stems from the decision of the Florida Department of Health and Rehabilitative Services, the state agency responsible for administering Florida's JOBS program, Fla.Stat.Ann. § 409.029(4)(a), to freeze the provision of child care services effective July 10, 1992. The freeze does not apply to individuals who were receiving child care services prior to the cut-off date. A projected budget deficit was cited as the reason for this action.

Thereafter, this suit was filed with Collene Maynard, Darlene Michal, and Tanja Mathis named as plaintiffs. They claim that the child care freeze forced them to forgo their education plans.[3] The plaintiffs sought both declaratory and injunctive relief. The plaintiffs also filed a motion for a preliminary injunction as well as a motion for class certification. The plaintiffs hinged their suit upon § 602(g)'s "guarantee" of child care. They alleged that 42 U.S.C. § 602(g) imposes a statutory obligation, regardless of a state's fiscal situation, to supply child care services to all AFDC recipients who are, or who wish to be, enrolled in an approved education or training program. In response, HRS primarily argues

---

      (iv) reimbursing the caretaker relative in the family; or

      (v) adopting such other arrangements as the agency deems appropriate.

When the State agency arranges for child care, the agency shall take into account the individual needs of the child.

42 U.S.C. § 602(g)(1)(B).

[3]Mathis enrolled in Project Independence with the avowed goal of earning an Associate of Arts degree at Tallahassee Community College. Maynard and Michal are seeking to earn their General Equivalency Diplomas ("GED").

that 42 U.S.C. § 602(a)(19), when read *in pari materia* with § 602(g), specifically allows a state to take its financial health into consideration when it decides on the extent to which it will make child care services available.

In brief, § 602(a) requires a state that wishes to participate in the AFDC program to submit a plan to the Secretary that details the state's proposed administration of the AFDC program. *See Heckler v. Turner,* 470 U.S. 184, 189, 105 S.Ct. 1138, 1141, 84 L.Ed.2d 138 (1985). Section 602(a)(19) details one required provision of a state's plan:

> A State plan for aid and services to needy families with children must—
>
> ....
>
> (19) provide—
>
> (A) that the State has in effect and operation a [JOBS] program which meets the requirements of part F of this subchapter;
>
> (B) that—
>
> (i) the State will (except as otherwise provided in this paragraph or part F of this subchapter), to the extent that the program is available in the political subdivision involved *and State resources otherwise permit*—
>
> (I) require all recipients of [AFDC] in such subdivision with respect to whom the State guarantees child care in accordance with section 602(g) of this title to participate in the program; and (II) allow applicants for and recipients of [AFDC] ... who are not required under subclause (I) to participate in the program to do so on a voluntary basis....

42 U.S.C. § 602(a)(19)(A)-(B)(i) (emphasis added). The named plaintiffs were all participating in Project Independence on a voluntary basis.

The litigants subsequently filed competing motions for summary judgment and HRS also filed a motion to dismiss the action. On April 15, 1994, the district court denied HRS's motions and granted the plaintiffs' motion for summary judgment. The district court's opinion, however, was specifically limited to Mathis; Maynard and Michal had failed to respond to an earlier order of the district court which directed them to update the court on their status. [4] This appeal followed.

## II. STANDARD OF REVIEW

The district court's opinion is not a final decision within the meaning of 28 U.S.C. § 1291, as it did not adjudicate the claims of all of the parties to this action, and as it did not direct entry of a final judgment in favor of Mathis "upon an express determination that there is no just reason for delay." Fed.R.Civ.P. 54(b). The district court's opinion is justiciable, however, as it enjoined HRS from denying child care to Mathis. 28 U.S.C. § 1292(a)(1).

We review the district court's grant of summary judgment by considering all factual issues in the light most favorable to the nonmoving party (herein HRS) and determining *de novo* whether there exists any genuine issue of material fact requiring submission of the case to the finder of fact or whether judgment as a matter of law was appropriate. Fed.R.Civ.P. 56(c); *Wilson v. Northcutt,* 987 F.2d 719, 721 (11th Cir.1993) (citation omitted).

---

[4]The district court did, however, indicate that it would consider the status of Maynard and Michal at a later date, when it addressed the class certification issue. These issues are not before us and we express no direct opinion on them.

III. DISCUSSION

*Private Right of Action Under 42 U.S.C. § 1983*

The appellants argue that summary judgment was wrongly granted below as no private right of action exists under 42 U.S.C. § 1983 to enable Mathis to enforce § 602(g)'s child care provisions. Section 1983 creates a cause of action for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. The Supreme Court has held that this language is not limited to constitutional violations; § 1983 potentially encompasses violations of all federal statutes. *Maine v. Thiboutot,* 448 U.S. 1, 4, 100 S.Ct. 2502, 2504, 65 L.Ed.2d 555 (1980).

The Court has, however, defined two exceptions to the applicability of § 1983 to claims based on statutory violations: (1) For an action to be cognizable under § 1983, it is not enough that the conduct in question merely violates federal law—that violation must trammel a "right" secured by federal law, *Golden State Transit Corp. v. City of Los Angeles,* 493 U.S. 103, 106, 110 S.Ct. 444, 448-49, 107 L.Ed.2d 420 (1989); *Wehunt v. Ledbetter,* 875 F.2d 1558, 1563 (11th Cir.1989), *cert. denied,* 494 U.S. 1027, 110 S.Ct. 1472, 108 L.Ed.2d 609 (1990); (2) Even if the statute in question creates such a right, a private right of action under § 1983 may still be unavailable if "Congress has foreclosed private enforcement in the enactment of the statute" through the inclusion of sufficiently comprehensive remedial devices. *Wehunt,* 875 F.2d at 1563 (citing *Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n,* 453 U.S. 1, 20-21, 101 S.Ct. 2615, 2626-27, 69

L.Ed.2d 435 (1981)).

A. *Existence of a Federal Right*

To ascertain whether 42 U.S.C. § 602(g) creates a "federal right" that is enforceable under § 1983, we must determine

> whether "the provision in question was intend[ed] to benefit the putative plaintiff." [*Golden State,* 493 U.S. at 106, 110 S.Ct. at 448 (citations and internal quotations omitted).] If so, the provision creates an enforceable right unless it reflects merely a "congressional preference" for a certain kind of conduct rather than a binding obligation on the governmental unit, *Pennhurst State School and Hospital v. Halderman,* 451 U.S. 1, 19 [101 S.Ct. 1531, 1540-41, 67 L.Ed.2d 694] (1981), or unless the interest the plaintiff asserts is " "too vague and amorphous' " such that it is " "beyond the competence of the judiciary to enforce.' " *Golden State,* [493 U.S.] at 106 [110 S.Ct. at 448] [ (quoting *Wright v. Roanoke Redevelopment & Hous. Auth.,* 479 U.S. 418, 431-32, 107 S.Ct. 766, 774-75, 93 L.Ed.2d 781 (1987)).]

*Wilder v. Virginia Hosp. Ass'n,* 496 U.S. 498, 509, 110 S.Ct. 2510, 2517, 110 L.Ed.2d 455 (1990). Furthermore, "each statute must be interpreted by its own terms." *Suter v. Artist M.,* 503 U.S. 347, 358 n. 8, 112 S.Ct. 1360, 1367 n. 8, 118 L.Ed.2d 1 (1992).

1. *Intent to Benefit*

The first step of our federal right analysis, therefore, is to determine whether Congress intended the child care provisions of § 602(g) to benefit AFDC recipients who are, or who wish to be, voluntarily enrolled in approved education or training activities. As was the case in *Wilder,*[5] it appears that the provisions in

---

[5]The *Wilder* Court concluded that there was "little doubt" that health care providers were the intended beneficiaries of the Boren Amendment:

> The provision establishes a system for reimbursement of providers and is phrased in terms benefiting health care providers: It requires a state plan to provide for "payment ... of the *hospital* services, *nursing facilities* services, and services in an *intermediate care facility* for the mentally retarded

question were indeed intended to benefit Mathis: The purpose behind Title IV-A, which contains the child care provisions here at issue, is "to help [the parents or relatives with whom needy dependent children are living] to attain or retain capability for the maximum self-support and personal independence consistent with the maintenance of continuing parental care and protection." 42 U.S.C. § 601. Section 602(g)(1)(A)(i)(II) furthers this end by "guarantee[ing] child care ... for each individual participating in an education and training activity ... if the State agency approves the activity and determines that the individual is satisfactorily participating in the activity." These statutory pronouncements convince us that § 602(g) was intended to benefit AFDC recipients who require child care services in order to participate in an education or training program under the JOBS program.

A comparison of § 602(g)'s child care provisions with the child support provisions of Title IV-D, 42 U.S.C. § 651 *et seq.,* which we addressed in *Wehunt v. Ledbetter,* is illustrative: In *Wehunt,* we held that the child support provisions of Title IV-D were not intended to benefit AFDC recipients. Beyond the first fifty dollars of child support collected each month, 42 U.S.C. § 602(a)(8)(A)(vi), the funds recovered through the workings of that title accrue directly to the state government. 42 U.S.C. § 602(a)(26)(A). Thus, Title IV-D's provisions were viewed as primarily designed to benefit all taxpayers: "[T]he goal of Title

_____

provided under the plan."

496 U.S. at 510, 110 S.Ct. at 2517-18 (quoting 42 U.S.C. § 1396a(a)(13)(A) (emphasis added) (other citation omitted).

IV-D was to immediately lower the cost to the taxpayer as well as to lessen the number of families enrolling in welfare in the future—benefits to society as a whole rather than specific individuals."  875 F.2d at 1565.

It is true that the child support provisions of § 602(g), which reduce long-term welfare dependence by facilitating the education and training of AFDC recipients, also benefit taxpayers as a whole.  The effects of this program, however, are ultimately personal;  the benefits of education and training accrue first and foremost to the individual who is being so educated or trained.

In marked contrast to the voluntary nature of Mathis's participation in Project Independence, "AFDC recipients do not apply for *nor request* support enforcement services [under Title IV-D].  They *assign* their child support rights to the state and are required to cooperate (unless good cause for refusing to do so is determined to exist) in whatever legal action the state undertakes."  *Id.* at 1566 (footnotes omitted).

Moreover, our holding in *Wehunt* impliedly acknowledged that Title IV-A was intended to benefit AFDC recipients:

> Title IV-D does not create any enforceable right:  it was not enacted for the "especial benefit" of AFDC families.  A Title IV-D program operates under a separate legislative and regulatory framework than that of a Title IV-A program.  Title IV-A provides funds from the public treasure to support children in need.  Title IV-D seeks to recover those funds and restore the Treasury balance by enforcement of support obligations owed by the absent parents of these children.

*Id.* at 1565.

2. *Binding Obligation*

Having found that the child care provisions of § 602(g) were intended to benefit individuals such as Mathis, the second step of

our inquiry addresses whether that section imposes a "binding obligation" upon HRS to provide child care or whether it merely expresses a "congressional preference" for the provision of child care. *Wilder,* 496 U.S. at 509, 110 S.Ct. at 2517.

(a) *Section 602(g)'s Reference to § 602(a)(19)*

We note initially that § 602(g) does purport to "guarantee" child care to individuals participating in approved education or training activities. Section 602(g), however, goes on to condition its guarantee by expressly referring to § 602(a)(19), which contains the "and State resources otherwise permit" language upon which the appellants rely.

Moreover, Title IV-F, which details the required elements of a state's JOBS program, also refers to § 602(a)(19). Section 682(a) of that title states: "As a condition of its participation in the program of [AFDC] under part A of this subchapter, each State shall establish and operate a [JOBS] program ... under a plan approved by the Secretary as meeting all of the requirements of this part and section 602(a)(19) of this title...." 42 U.S.C. § 682(a)(1)(A).[6]

As discussed above, § 602(a)(19) provides, in part, that AFDC recipients must be "allow[ed]" to voluntarily participate in the JOBS program to the extent that "State resources otherwise permit." The express reference to this provision by both § 602(g), which "guarantee[s]" child care, and by § 682(A)(1)(A), which addresses

---

[6]*See also,* 42 U.S.C. § 602(a)(44)(A) (stating that a state plan must "provide that the State agency shall—(A) be responsible for assuring that the benefits and services under the programs under this part ... and part F of this subchapter are furnished in an integrated manner").

the states' establishment of their JOBS programs, demonstrates that Congress intended for a state to consider the extent of its available resources when it determined the overall scope of its JOBS program—including the provision of child care services.

(b) *Section 602(a)(19)'s Reference to § 602(g)*

Furthermore, § 602(a)(19) references § 602(g). Section 602(a)(19)(B)(i)(I) asserts that a state "will ... *require* all recipients of [AFDC] in such subdivision with respect to whom the State guarantees child care in accordance with section 602(g) of this title to participate in the [JOBS] program." In other words, the state must guarantee the provision of child care services to those individuals who are *required* to participate in the JOBS program. However, subclause (II), which discusses voluntary participation, does *not* refer to § 602(g)'s child care guarantee. 42 U.S.C. § 602(a)(19)(B)(i)(II). Thus, § 602(g)'s limited child care guarantee does not apply to Mathis, as she chose to participate in Project Independence on a voluntary basis. 42 U.S.C. § 602(a)(19)(B)(i)(II).

(c) *Conclusion*

There are, we admit, several obstacles to a smooth *in pari materia* reading of §§ 602(g) and 602(a)(19). First, both sections are rather long and involved. However, neither section attempts to constrict its reference to the other, and we must presume that Congress knew how to be more specific if it wished to be. Therefore, we presume that § 602(g) was intended to reference the relevant portions of § 602(a)(19), and that § 602(a)(19) was intended to reference the relevant portions of § 602(g).

Second, whereas these two provisions are now subsections of the same section, they were originally enacted under different titles of the Family Support Act of 1988.[7] We conclude, however, that while this fact should inform our analysis, it need not dictate our result. As discussed above, each section expressly refers to the other—we find this fact to be sufficient to overcome any interpretative difficulty which their legislative disjointedness otherwise presents.

Third, unfortunate results seem to flow from this decision. It is safe to say that disadvantaged people with children are likely to be more needy than disadvantaged people without children. Under our reading of the Family Support Act of 1988, Florida may effectively cut off the former group's participation in its JOBS program by freezing the provision of child care while continuing to allow individuals from the latter group to voluntarily enroll. Allowing the state to deny child care to these "more" needy individuals seems unfair. We recognize, however, that state resources are not unlimited and hard choices have, sometimes, to be made. Regrettably, Henry David Thoreau was not universally correct when he wrote that "[i]t costs us nothing to be just." Henry D. Thoreau, *John Brown's Body,* in *The Works of Thoreau* 825, 827 (Henry S. Canby ed., 1937).

All in all, as our discussion demonstrates, this case presents a most difficult question, but we are constrained to find that the

---

[7]Section 602(g) was enacted under Title III of the Family Support Act: "Supportive Services for Families." Section 602(a)(19) was enacted under Title II: "Job Opportunities and Basic Skills Training Program."

mutual cross-references of §§ 602(g) and 602(a)(19) modify the otherwise obligatory language of § 602(g)'s child care guarantee. The district court's opinion, which is well-reasoned in every other respect, only fails, as we see it, to grant these mutual cross-references their proper weight. We must, therefore, disagree with that court's conclusion.

We assume that Congress would *prefer* that all individuals voluntarily enrolled in approved education and training activities would receive child care, but we conclude that Congress did not intend for 42 U.S.C. § 602(g) to impose a binding obligation upon the states to provide child care to these volunteers on an unlimited basis. Accordingly, we must find that no private right of action exists under § 1983 to allow a voluntary participant in a JOBS program to enforce the child care provision of § 602(g).[8]

---

[8]This conclusion is in keeping with the Supreme Court's interpretative guidance in this area: "[T]he starting point of the [AFDC] analysis must be a recognition that the federal law gives each State great latitude in dispensing its available funds." *Dandridge v. Williams,* 397 U.S. 471, 478, 90 S.Ct. 1153, 1158, 25 L.Ed.2d 491 (1970). *See also Anderson v. Edwards,* --- U.S. ----, ----, 115 S.Ct. 1291, 1296, 131 L.Ed.2d 178 (1995) (identifying the *Dandridge* Court's language, quoted *supra,* as the "cardinal principle" of statutory interpretation in the AFDC context). Our finding is also consistent with Congress's recognition of the limited nature of state resources. In the preamble to the AFDC program, Congress stated:

> For the purpose of encouraging the care of dependent children in their own homes or in the homes of relatives by enabling each State to furnish financial assistance and rehabilitation and other services, *as far as practicable under the conditions in such State,* to needy dependent children and the parents or relatives with whom they are living to help maintain and strengthen family life and to help such parents or relatives to attain or retain capability for the maximum self-support and personal independence consistent with the maintenance of continuing parental care and protection, there is hereby authorized to be

B. *Remaining Issues*

In light of our finding that no private right of action exists under § 1983 to allow Mathis to enforce § 602(g)'s child care provisions, we need not address the issue of whether these provisions are too vague and amorphous to be effectively interpreted and enforced by the judiciary. In addition, we need not address whether the Social Security Act, as amended by the Family Support Act, contains a remedial scheme which is sufficiently comprehensive to foreclose private enforcement under § 1983. Furthermore, we need not reach the question of standing nor need we reach the merits of this matter.

We note in closing that we do not feel that our decision nullifies in any way the child care provisions of the Family Support Act: Florida's continued receipt of funding at its current level is conditioned upon its compliance with all of the Social Security Act's requirements.[9] *E.g.,* 42 U.S.C. § 604. As the issue is not before us, however, we express no opinion on what sort of showing would be required—were the Secretary to later challenge Florida's action—to demonstrate that state resources did not

----

> appropriated for each fiscal year a sum sufficient to carry out the purposes of this part....

42 U.S.C. § 601.

[9]It is true that the *Wilder* Court found the conditional provision of federal funds influential in its conclusion that the Boren Amendment does impose an obligation on states participating in the Medicaid program which may be privately enforced under § 1983. 496 U.S. at 512, 110 S.Ct. at 2518-19. As discussed above, however, the child care provisions of the Family Support Act are lacking—in light of § 602(g)'s reference to § 602(a)(19)—that mandatory cast which the *Wilder* Court also found so influential. *Id.*

"otherwise permit" the provision of child care services to individuals such as Mathis.

## IV. CONCLUSION

For the reasons set forth above, we REVERSE the grant of summary judgment by the district court and REMAND for further proceedings consistent with this opinion.