Foster Children BONNIE L., By and Through her next friend Donald HADSOCK, et al., Plaintiffs,

v.

Jeb BUSH, as Governor of the State of Florida, et al., Defendants.

No. 00–2116–Civ.

United States District Court, S.D. Florida, Miami Division.

Dec. 4, 2001.

Karen Gievers, Gievers, P.A., Tallahassee, FL, Theodore Babbitt, Babbitt, Johnson & Osborne, West Palm Beach, FL, Barbara C. Burch, Bill Fraser, Michelle Hankey, West Palm Beach, FL, Kevin S. Cannon, Orlando, FL, William M. Chanfrau, Chanfrau, Chanfrau & Bouch, Daytona Beach, FL, Jerold Feuer, Miami, FL, Rose Firestein, Marcia Lowry, Children's Rights, Inc., New York City, Robert

Glenn, Glenn, Rasmussen, Tampa, FL, Leslie Goller, Wayne Hogan, Brown, Terrell, Hogan, Jacksonville, FL, Robert Kerrigan, Kerrigan Estes, Pensacola, FL, Robert Montgomery, Montgomery & Larmoyeux, West Palm Beach, FL, John B. Ostrow, Miami, FL, Bernard P. Perlmutter, Carolyn Salisbury, Univ. of Miami Law School, Coral Gables, FL, Gregory A. Samms, Ocean Optique Tower, Miami, FL, Deborah Schroth, Florida Legal Services, Jacksonville, FL, Neil C. Spector, Tampa, FL, Susan Stockham, Sarasota, FL, Greg Tynan, Orlando, FL, James Walsh, John Walsh, West Palm Beach, FL, Roy Wasson, Miami, FL, Claudia Wright, Gator Teamchild, University of Florida, Levin College of Law, Gainesville, FL, Jay C. Howell, Jacksonville Beach, FL, Cynthia A. McNeely, With Arms Open Wide Foundation, Tallahassee, FL, Christina A. Zawisa, John M. Ratliff, Ft. Lauderdale, FL, for plaintiffs.

Jason Vail, AAG, Cecilia Bradley, AAG, Office of the Attorney General, The Capitol –PL01, Tallahassee, FL, for defendants.

### ORDER GRANTING IN PART DEFENDANTS' MOTIONS TO DISMISS

MORENO, District Judge.

Plaintiffs filed this action for declaratory and injunctive relief relating to the operation of Florida's foster care system. The 116 page, 226 paragraph, six count Amended Complaint seeks relief pursuant to 42 U.S.C. § 1983 and is brought on behalf of Florida's 15,000 foster children. The suit challenges Defendants' pattern and practice of failing to fulfill their constitutional and statutory obligations toward the safety, stability, and health of the children, and deliberate indifference toward the alleged pattern and practice.

The Amended Complaint alleges violations of (1) substantive due process; (2) procedural due process; (3) the First, Ninth and Fourteenth Amendment rights to familial association; (4) violation of the federal Adoption and Safe Family Act; (5) violation of the Early Periodic Screening, Diagnosis and Treatment (EPSDT) provision of Medicaid; and (6) violation of rights under the Title VI financial assistance program. As of the time of the Amended Complaint, the Plaintiffs and putative class representatives included Bonnie L., age 17, Reggie and Rebecca B., ages 13, Laurie and Lillie S., ages 10 and 8, Leslie F., age 17, Sandra M., age 16, Tanya M., age 14, Jay and Candice D., age 9 and 10, Matthew I., age 2, Hugh S., age 16, Leanne and Tammy G., ages 2 and 9, Elaine R., age 11, Paul B., age 16, Rachel C., age 13, Cathy W., age 12, Larissa C., age 2, John J., age 12, and Melinda and Karina, ages 18 and 17. The Amended Complaint gives an extensive account of each Plaintiff's experience in the foster care system; an account of each youth is more fully described in Magistrate Judge Dubé's Report and Recommendation of April 20, 2001. Defendants are Governor Jeb Bush, Judge Kathleen Kearney, Secretary of Department of Children and Family Services (the "Department" or "DCF"), and District Administrators Chuck Bates, John Awad, Ester Tibbs, Lee Johnson, Lynn Richard, Don Dixon, Robert Morin, Fran Gibbons, Paul Brown, Charles Auslander, Christine Davenport, Patrick Howard, Sue Gray, and Vern Martin.

All Defendants except Governor Bush filed a collective motion to dismiss (D.E. No. 93) asserting various grounds discussed more fully below. Governor Bush's motion to dismiss (D.E. No. 94) asserts the additional grounds that as alleged there is no basis for equitable relief against the Governor and there is no basis for liability under § 1983. All Defendants have supplemented arguments raised in their initial motion to dismiss by filing additional mo-

tions to dismiss. These additional motions to dismiss seek to dismiss certain claims for lack of standing (D.E. No. 335), to dismiss certain named plaintiffs for mootness (D.E. No. 336), and to dismiss the action based on abstention and Eleventh Amendment grounds (D.E. No. 408).

## Analysis

### A. Eleventh Amendment Immunity

 Defendants claim that this action should be barred on Eleventh Amendment Grounds. The Eleventh Amendment states, "The judicial powers of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. The Amendment applies equally to suits against a state initiated by that state's own citizens. *Edelman v. Jordan,* 415 U.S. 651, 663, 94 S.Ct. 1347, 1356, 39 L.Ed.2d 662 (1974); *Summit Medical Assoc., P.C. v. Pryor,* 180 F.3d 1326, 1336 (11th Cir.1999). There is a long recognized exception to this rule for suits against state officers seeking prospective equitable relief to end ongoing and continuous violations of federal law. *See Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908); *Idaho v. Coeur d'Alene Tribe,* 521 U.S. 261, 269, 117 S.Ct. 2028, 2034, 138 L.Ed.2d 438 (1997). Generally, the Eleventh Amendment does not bar the exercise of the judicial power where a plaintiff seeks to compel a state to comply with federal law. *Summit,* 180 F.3d at 1336.

 A suit seeking prospective rather than retrospective relief is not barred so long as the prospective relief sought is not the functional equivalent of money damages. *Edelman,* 415 U.S. at 669, 94 S.Ct. at 1358. "In other words, a plaintiff may not use the doctrine to adjudicate the legality of past conduct." *Summit,* 180 F.3d at 1337 (citing *Papasan v. Allain,* 478 U.S. 265, 277–78, 106 S.Ct. 2932, 2940, 92 L.Ed.2d 209 (1986)). As stated in the Magistrate's Report and Recommendation, "In the present case, the Amended Complaint seeks a declaration that certain acts by the Defendants are unconstitutional and unlawful and asks the Court to enjoin such practices and take remedial action to ensure that the Defendants comply with all such laws in the future." *Foster Children v. Jeb Bush,* slip op. at 20 (S.D.Fla. April 20, 2001) (Magistrate Report & Recommendation). "An allegation of an ongoing violation of federal law where the requested relief is prospective is ordinarily sufficient to invoke the *Young* fiction.." *Coeur d'Alene Tribe,* 521 U.S. 261, 281, 117 S.Ct. 2028, 2040.

The inquiry does not end there, however, as Defendants rely on *Coeur d'Alene* in support of its position that the Eleventh Amendment bars this Court from hearing this suit. Defendants' contention is that state dependency courts are already addressing many of the issues raised in this suit, however, they fail to specify which aspects are being addressed. Defendants note that in *Coeur d'Alene* Justice Kennedy remarked, "A doctrine based on the inherent inadequacy of state forums would run counter to basic principles of federalism." *Id.* at 275, 117 S.Ct. at 2037 (non-majority opinion). This portion of Justice Kennedy's opinion, found in part II. B., however, did not receive the support of five Justices and, therefore, is not part of the Supreme Court's holding. Nevertheless, there are two doctrines that merit examination and their relationship to the individual causes of action asserted in the instant suit, one from *Idaho v. Coeur d'Alene Tribe,* 521 U.S. 261, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997), the "special sovereign interests doctrine," and one from *Seminole Tribe of Fla. v. Florida,* 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996), involv-

ing the existence of a detailed remedial scheme.

### 1. *Coeur d'Alene's* Special Sovereign Interests

The *Coeur d'Alene* Court limited the *Ex parte Young* doctrine when the equitable relief sought "implicates special sovereign interests." *Coeur d'Alene*, 521 U.S. 261, 281, 117 S.Ct. 2028, 2040. In that suit an Indian tribe sought declaratory and injunctive relief to resolve the tribe's right to quiet enjoyment over certain state lands. In finding that the Eleventh Amendment barred the action despite the fact that the suit sought only prospective injunctive relief, the Court held, "that if the Tribe were to prevail, Idaho's sovereign interest in its lands and waters would be affected in a degree fully as intrusive as almost any conceivable retroactive levy upon funds in its Treasury." *Id.* at 287, 117 S.Ct. at 2043.

Although no reported Eleventh Circuit case has analyzed in detail *Coeur d'Alene's* "special sovereign interests" requirement in a suit for prospective relief from the ongoing violation of federal laws and for reform of a state's system,[1] *Doe v. Chiles,* 136 F.3d 709 (11th Cir.1998), decided after *Coeur d'Alene*, dealt with Eleventh Amendment immunity in a suit seeking prospective injunctive relief to enjoin violations of the Medicaid Act, 42 U.S.C. § 1396(a)(8). *Id.* at 711. The *Doe* court relied on *Tallahassee Mem. Reg. Med. Ctr. v. Cook,* 109 F.3d 693 (11th Cir.1997), a suit about the organizational and funding deficiencies in the state's medical assistance program, and held that "the instant lawsuit fits neatly within the *Ex parte Young* exception. Like the hospitals in *Cook,* the appellees in this case seek prospective injunctive relief to enjoin state officials from continuing to violate federal law, that is, the Medicaid Act." Thus, the Eleventh Amendment did not bar the federal court from hearing that controversy.

The Tenth Circuit, meanwhile, has considered *Coeur d'Alene's* impact in two suits closely analogous to the instant suit. In both cases the Tenth Circuit determined that administering a welfare program is not a "special sovereign interest," and looked to *Doe v. Chiles* from the Eleventh Circuit.

In *J.B. ex rel Hart v. Valdez,* 186 F.3d 1280 (10th Cir.1999), plaintiffs sought prospective injunctive relief to reform the way the state was administering a welfare program in a putative class action involving mentally or developmentally disabled children in the custody of the state of New Mexico. After a thorough examination of Supreme Court precedent and *Coeur d'Alene,* the *Valdez* court held, "A state's interest in administering a welfare program at least partially funded by the federal government is not such a core sovereign interest as to preclude the application of *Ex parte Young*." *Valdez,* 186 F.3d at 1287 (citing *Doe v. Chiles,* 136 F.3d 709, 720 (11th Cir.1998)).

The court in *Joseph A. v. Ingram,* 262 F.3d 1113 (10th Cir.2001), used *Valdez* to reach an identical result in a suit seeking prospective injunctive relief for the Adoption and Safe Families Act of 1997 ("ASFA"), 42 U.S.C. §§ 673b, 679b & 678, and the Adoption Assistance and Child Welfare Act of 1980, 42 U.S.C. §§ 670 *et seq.* After noting that *Valdez* was squarely on point with its case, the *Joseph A.* court held, "Although we recognize that a state's administration of federally-funded welfare programs for children in its custody involves important state interests, those

---

1. *Summit Med. Assoc., P.C. v. Pryor,* 180 F.3d 1326 (11th Cir.1999), was a suit challenging Alabama's partial-birth abortion act.

interests do not implicate the 'essential attribute[s] of sovereignty' with which *Coeur d'Alene* was concerned. Therefore, we hold that *Coeur d'Alene* does not remove this action from the scope of the *Ex parte Young* doctrine." *Joseph A.,* 262 F.3d at 1120 (internal citations omitted).

■ *Coeur d'Alene* does not serve as a bar to Plaintiffs' EPSDT Medicaid Act count, *see Doe v. Chiles,* 136 F.3d 709, 720 (11th Cir.1998), Plaintiffs' ASFA count, *see Joseph A. v. Ingram,* 262 F.3d 1113 (10th Cir.2001), or the Title VI claims. *See Sandoval v. Hagan,* 197 F.3d 484 (11th Cir. 1999) *rev'd on other grounds sub nom. Alexander v. Sandoval,* 532 U.S. 275, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001) (holding state waived sovereign immunity by receiving federal funds and that prospective injunctive relief is still available against director in his official capacity for continuing violations).

### 2. Detailed Remedial Scheme—*Seminole Tribe*

In *Seminole Tribe of Fla. v. Florida,* 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996), the Supreme Court established that the Eleventh Amendment bar, lifted by *Ex parte Young* for suits seeking prospective injunctive relief, should not be raised where Congress has created a detailed remedial scheme for the enforcement of a statutorily created right against a state. *Id.* at 74, 116 S.Ct at 1132. The Court held:

> [T]he question is not whether a remedy should be created, but instead is whether the Eleventh Amendment bar should be lifted, as it was in *Ex parte Young,* in order to allow a suit against a state officer. Nevertheless, we think that the same general principle applies: Therefore, where Congress has prescribed a detailed remedial scheme for the enforcement against a State of a statutorily created right, a court should hesitate before casting aside those limitations and permitting an action against a state officer based upon *Ex parte Young.*

*Id.* A key factor that a court must consider in applying *Seminole Tribe* is whether "Congress chose to impose upon the State a liability that is significantly more limited than would be the liability imposed upon the state officer under *Ex parte Young.*" *Id.* at 76–77, 116 S.Ct. at 1133. Where such liability is limited by the remedial scheme created by Congress, it is a strong indication that Congress had no wish to allow for the application of *Ex parte Young. Id.* The *Seminole Tribe* Court ultimately determined that *"Ex parte Young* is inapplicable to petitioner's suit against the Governor of Florida, and therefore that suit is barred by the Eleventh Amendment and must be dismissed for a lack of jurisdiction." *Id.*

Defendants claim that the administrative remedy provided by EPSDT is a sufficient enforcement scheme to invoke *Seminole Tribe.* Defendants' contention is that Plaintiffs "must compel HHS—which can and must be sued in federal court—to find Florida out of compliance with federal law and to seek to withhold Florida's federal share of Medicaid payments." Def.Mot. to Dis. at 20–21.

In *Seminole Tribe,* the Court was confronted with the Indian Gaming Regulatory Act, 25 U.S.C. § 2710(d). The Court concluded after examining the statutory scheme that Congress intended the provisions of § 2710(d)(3) [2] to be enforced in an action brought under § 2710(d)(7). Section 2710(d)(7) confers jurisdiction on federal district courts to hear a controversy

---

**2.** Section 2710(d)(3) "imposes upon the States a duty to negotiate in good faith with an Indian tribe toward the formation of a compact" concerning gaming activities. *Seminole Tribe,* 517 U.S. at 47, 116 S.Ct. at 1119.

between the Indian tribe and the State with whom the negotiations on the compact are required under § 2710(d)(3), and serves to limit the relief that can be administered. Section 2710(d)(7) allows the Indian tribe itself to initiate the suit and take advantage of the statutory remedial scheme that the Court determined prevented the application of *Ex parte Young.* *See* 25 U.S.C. § 2710(d)(7) ("An Indian tribe may initiate a cause of action described in subparagraph (A)(i) only after the close of the 180–day period beginning on the date on which the Indian tribe requested the State to enter into negotiations under paragraph (3)(A)."). In other words the aggrieved party is provided with a detailed mechanism with which it can seek to enforce its rights.

■ Defendants point to the administrative remedy available in 42 C.F.R. § 430.38.[3] This remedy when coupled with the scheme provided in 42 U.S.C. § 1396c[4] permits the state to sue the Secretary of HHS. Defendants assert that this is sufficiently analogous to *Seminole Tribe.* A significant difference between the scheme under the Indian Gaming Regulatory Act and Medicaid is that in the former, the aggrieved entity can bring an action as provided by the statute on its own behalf, while under Medicaid, the aggrieved individual is unable to assert his own rights but must rely on a third party to champion his cause. Medicaid also differs from the statute in *Seminole Tribe* in that it does not provide a mediation process, an administrative process, or impose a particular burden of proof. Numerous courts have similarly found § 2710(d)(7)'s remedial scheme disanalogous. *See e.g., Telespectrum, Inc. v. Public Service Com'n of Kentucky,* 227 F.3d 414, 420 (6th Cir.2000) ("Unlike the statutory scheme at issue in *Seminole Tribe,* section 332(c)(7)(B) does not provide for either a 'detailed' or an 'intricate' regulatory scheme. The section provides only that action may be maintained in 'any court of competent jurisdiction,' but does not provide for a mediation process, mandate negotiations, impose a shifting burden of proof, or permit the promulgation of regulations by a federal official to resolve a specific dispute."); *MCI Telecommunications Corp. v. Illinois Bell Telephone Co.,* 222 F.3d 323, 347 (7th Cir.2000) ("Unlike the IGRA, in which 'Congress chose to impose upon the State

---

**3.** 42 C.F.R. § 430.38 deals with judicial review and holds:

> (a) Right to judicial review. Any State dissatisfied with the Administrator's final determination on approvability of plan material (§ 430.18) or compliance with Federal requirements (§ 430.35) has a right to judicial review.
> (b) Petition for review.
> (1) The State must file a petition for review with the U.S. Court of Appeals for the circuit in which the State is located, within 60 days after it is notified of the determination.

The determination of the circuit court is reviewed by the United States Supreme Court. 42 C.F.R. § 430.38(e).

**4.** 42 U.S.C. 1396c holds:

> If the Secretary, after reasonable notice and opportunity for hearing to the State agency administering or supervising the administration of the State plan approved under this subchapter, finds—
> (1) that the plan has been so changed that it no longer complies with the provisions of section 1396a of this title; or
> (2) that in the administration of the plan there is a failure to comply substantially with any such provision;
> the Secretary shall notify such State agency that further payments will not be made to the State (or, in his discretion, that payments will be limited to categories under or parts of the State plan not affected by such failure), until the Secretary is satisfied that there will no longer be any such failure to comply. Until he is so satisfied he shall make no further payments to such State (or shall limit payments to categories under or parts of the State plan not affected by such failure).

a liability that is significantly more limited than would be the liability imposed upon the state officer under *Ex parte Young*,' *Seminole Tribe,* 517 U.S. at 75–76, 116 S.Ct. 1114, Congress has not limited the court's remedial power under subsection 252(e)(6) of the 1996 Telecommunications Act."). Furthermore, in both *Doe v. Chiles,* 136 F.3d 709 (11th Cir.1998) and *Tallahassee Mem. Reg. Med. Ctr. v. Cook,* 109 F.3d 693 (11th Cir.1997), post *Seminole Tribe* cases, the Eleventh Circuit reviewed the relationship of the Eleventh Amendment to Medicaid and failed to hold that statute contained "detailed remedial schemes" that would bar the applicability of *Ex parte Young.* Similarly, *Seminole Tribe* does not present an Eleventh Amendment problem for Title VI, 42 U.S.C. § 2000d. *See Sandoval,* 197 F.3d at 494 ("Therefore, we can find no constitutional defect inherent in the explicit state immunity waiver enacted pursuant to the Spending Clause in Section 2000d–7.").

The scheme in the Adoption and Safe Families Act, 42 U.S.C. §§ 671 *et seq.,* presents a different scenario and dictates a different result. Although Defendants did not raise a defense based on *Seminole Tribe* in connection with the remedial scheme devised in connection with that statute, this Court considers the applicability of *Seminole Tribe* in light of *Joseph A.,* 262 F.3d 1113, recently decided by the Tenth Circuit.

■ The *Joseph A.* court was confronted with a suit involving children committed to the custody of the Youth and Families Department of New Mexico. One of the claims at issue was a claim involving ASFA and the Adoption Assistance and Child Welfare Act. The Tenth Circuit applied *Seminole Tribe* and held as follows:

> Title IV was amended in 1997 to include the Adoption and Safe Families Act. The ASFA conditioned the receipt of certain federal funds on a state's

adherence to a comprehensive set of statutory and regulatory standards imposing federally-defined objectives and administrative procedures for states' child welfare services, see 42 U.S.C. §§ 671 et seq.; 45 C.F.R. §§ 1355.21(b) & 1355.30, the contents of individual case plans for children participating in the programs, see 42 U.S.C. §§ 671(a)(16) & 675(1), and appeals of award decisions, see 45 C.F.R. § 1355.30; 45 C.F.R. Part 16. The regulations issued to implement the ASFA require that states conduct periodic self-evaluations of their compliance with these requirements, see id. § 1355.32, and to submit to federal administrative oversight by the Department of Health and Human Services ("HHS"), see generally id. §§ 1355.32–1355.34. States whose child welfare services are found not to be in substantial conformity with the federal requirements are required to develop a program improvement plan identifying action steps required to bring the service into conformity and benchmarks against which progress is to be measured. See id. § 1355.35. Should HHS disagree with the contents of a mandatory program improvement plan and be unable to reach a consensus with the state involved, HHS retains the authority to dictate the terms of the improvement plan. See id. § 1355.35(2). States that fail to come into substantial compliance with the ASFA's planning requirements face a graduated series of reductions in their funding eligibility under the act. See id. § 1355.36(b)–(e).

> Turning to Title XX of the Social Security Act, we find a comparably detailed remedial scheme set forth within the accompanying regulations. See 45 C.F.R. §§ 96.50 et seq. The regulations require parties who wish to assert that a state has misapplied funds provided in a block grant to submit a complaint to

specified officials within HHS and to comply with a detailed set of procedures for administrative hearings and appeals. *See id.* §§ 96.50(b)–(e), 96.51, 96.52. When funds provided through a block grant are inappropriately allocated by a state, the proper remedy is for the state to repay the funds to HHS, or, if repayment is not forthcoming, for HHS to reduce the following year's block grant by a commensurate amount. *See id.* § 96.51(a)–(b).

We find the comprehensive statutory and regulatory provisions governing Titles IV and XX demonstrate that Congress meant to preclude reliance on the broad provisions of an *Ex parte Young* suit to enforce the federal statutory standards governing state child adoption and welfare services. *Cf. Westside Mothers v. Haveman*, 133 F.Supp.2d 549, 574–75 (E.D.Mich.2001) (applying Seminole Tribe to preclude *Ex parte Young* action under federal Medicaid statute where statute authorized secretary of Health and Human Services to withdraw federal funding from non-compliant states). We therefore hold that those portions of the injunction that are intended to enforce rights created by Title IV of the Social Security Act are not amenable to enforcement pursuant to the *Ex parte Young* doctrine, and thus we must reverse in part the district court's conclusion that this action is not barred by the Eleventh Amendment.

*Joseph A.*, 262 F.3d at 1122–23 (footnotes omitted). The regulations passed pursuant to ASFA allow an individual to present a claim to an administrator. Under *Seminole Tribe* such an alternative scheme prevents *Ex parte Young* from lifting the bar imposed by the Eleventh Amendment.

In sum, the Medicaid Act claim is not barred from the ambit of *Ex parte Young.* Following the Tenth Circuit's decision in *Joseph A.*, the ASFA claim is, however, barred by the Eleventh Amendment under

*Seminole Tribe.* Therefore, Plaintiffs' claim dealing with the Adoption and Safe Families Act (Count 4) is DISMISSED.

## B. *Younger* Abstention

■ Abstention from the exercise of federal jurisdiction is the exception and not the rule. *Colorado River Water Conservation Dist. v. U.S.*, 424 U.S. 800, 817, 96 S.Ct. 1236, 1246, 47 L.Ed.2d 483 (1976); *New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 359, 109 S.Ct. 2506, 2513, 105 L.Ed.2d 298 (1989) (*"NOPSI "*). As the Supreme Court held in *NOPSI,* "Our cases have long supported the proposition that federal courts lack the authority to abstain from the exercise of jurisdiction that has been conferred." *Id.* at 358, 109 S.Ct. at 2513.

There are, however, some "classes of cases in which the withholding of authorized equitable relief because of undue interference with state proceedings is the 'normal thing to do.' " *NOPSI*, 491 U.S. at 359, 109 S.Ct. at 2513. The genesis of the *Younger* abstention doctrine came in the case bearing its name which involved a facial First Amendment based challenge to a California criminal law. In *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), the Court held that a federal court should not enjoin pending state criminal proceedings and, therefore, should abstain from hearing the suit. The doctrine has not been limited solely to the criminal context; the Court subsequently has expanded the protection of *Younger* to "civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions." *NOPSI*, 491 U.S. at 367–68, 109 S.Ct. at 2518 (citing *Juidice v. Vail*, 430 U.S. 327, 336, n. 12, 97 S.Ct. 1211, 1217, n. 12, 51 L.Ed.2d 376 (1977) (civil contempt order); *Pennzoil Co. v. Texaco Inc.*, 481 U.S. 1, 13, 107 S.Ct. 1519,

1527, 95 L.Ed.2d 1 (1987) (requirement for the posting of bond pending appeal)).

■■■■ The factors for determining whether a federal court should abstain were expressed in *Middlesex County Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432, 102 S.Ct. 2515, 2521, 73 L.Ed.2d 116 (1982):

> The question . . . is threefold: first, do state bar disciplinary hearings within the constitutionally prescribed jurisdiction of the State Supreme Court constitute an ongoing state judicial proceeding; second, do the proceedings implicate important state interests; and third, is there an adequate opportunity in the state proceedings to raise constitutional challenges.

Naturally, this standard has formed the basis for analyzing *Younger* abstention issues in the Eleventh Circuit. *See e.g., Old Republic Union Ins. Co. v. Tillis Trucking Co., Inc.*, 124 F.3d 1258, 1261 (11th Cir. 1997); *Butler v. The Alabama Judicial Inquiry Comm.*, 245 F.3d 1257, 1262 (11th Cir.2001), *answer to certified question conformed* 261 F.3d 1154 (11th Cir.2001). A requirement implicit in the *Middlesex* test is that the federal relief sought would actually interfere with the ongoing state judicial proceeding. *See Green v. City of Tucson*, 255 F.3d 1086, 1097 (9th Cir.2001) (en banc) ("[T]he three-part test we derived from *Middlesex* is a suitable guide for

analysis only when the threshold condition of the *Younger* abstention is present—that is, when the relief sought in federal court would in some manner directly 'interfere' with ongoing state judicial proceedings.").[5]

In suits for prospective injunctive relief, courts have been troubled by the specter of an ongoing scrutiny of state judicial proceedings even those that are not yet pending and of having to enforce a federal injunction against state judicial officers. In *O'Shea v. Littleton*, 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974), a class action was brought against Illinois magistrate and circuit court judges for allegedly administering the criminal justice system—particularly the setting of bail—in a manner violative of the Constitution. *Id.* at 490, 94 S.Ct. at 673. Plaintiffs sought an injunction preventing the occurrence of specific events that might take place in future state criminal trials. *Id.* at 500, 94 S.Ct. at 678. The Supreme Court determined that a system of periodic reporting would constitute "an ongoing federal audit of state criminal proceedings," that *Younger* seeks to prevent and "is antipathetic to established principles of comity." *Id.* at 500–01, 94 S.Ct. at 678–79. The *O'Shea* Court was troubled that an injunction would "necessarily impose continuing obligations of compliance" on the respondents, the state judicial officers, and questioned "how compliance might be enforced if the

---

5. This requirement was easily met in *Middlesex, Butler,* and *Old Republic,* all of which held the *Younger* abstention was applicable and thus barred the federal court from hearing the suit. The *Middlesex* plaintiffs sought to prevent a state bar disciplinary procedure from proceeding against them by challenging the disciplinary rules allegedly violated on First Amendment grounds. *Middlesex,* 457 U.S. at 428, 102 S.Ct. at 2519–20; *see also Green,* 255 F.3d at 1095 ("There was no doubt . . . that the plaintiffs in *Middlesex* were seeking to 'interfere' quite directly with the pending, state-instigated disciplinary proceedings, for they were asking the federal court to en-

join those enforcement proceedings. . . . The three factors that became our *Younger* standard first appeared as the *Middlesex* Court's summary of three *other* issues pertaining to *Younger* that *were* in dispute in the case."). Similarly, the plaintiff in *Butler* sought to enjoin ethics disciplinary proceedings by challenging the applicable rule's constitutional validity. *Butler,* 261 F.3d at 1156. In *Old Republic,* the plaintiffs filed for declaratory relief to avoid having to pay a state court judgment and to have its obligations determined by a federal court rather than a state court. *Old Republic,* 124 F.3d at 1259–60.

beneficiaries of the injunction were to charge that it had been disobeyed." *Id.*

In *Luckey v. Miller,* 976 F.2d 673, 676 (11th Cir.1992) (*"Luckey V"*)[6], a suit factually rather analogous to the instant suit, the plaintiffs asserted a class action on behalf of "all individuals who are or will in the future be adversely affected by the unconstitutional practices of the indigent defense system within Georgia." In that suit for prospective injunctive relief, the plaintiffs sought relief for indigent defendants at various pretrial stages, uniform standards for the representation of criminal defendants, and monitoring of those standards. *See Luckey V,* 976 F.2d at 676. Similar to the Court in *O'Shea,* the *Luckey V* court was troubled with enforcement of any injunction that a federal court could issue. The *Luckey V* court expressed its concern by quoting Judge Edmonson's dissent in *Luckey v. Harris,* 896 F.2d 479, 482 (11th Cir.1989) (*"Luckey II"*) (Edmonson, J., dissenting), wherein he wrote, "If a state court judge does not obey a district court's injunction, are we willing to jail the state court judge for contempt? Avoidance of this unseemly conflict between state and federal judges is one reason for *O'Shea* and *Younger."* The *Luckey V* court reasoned that plaintiffs intended "to restrain every indigent prosecution and contest every indigent conviction until the systemic improvements they seek are in place." *Luckey V.,* 976 F.2d at 677. In discussing *Luckey V,* the Eleventh Circuit held that where the effect of an injunction would inevitably interfere with future state proceedings, Younger does not only bar federal courts from restraining ongoing state court prosecutions, it can bar suits for "prospective relief involving cases that are not yet pending." *Pompey v. Broward County,* 95 F.3d 1543, 1547–48 (11th Cir. 1996) (citing *Luckey V,* 976 F.2d at 677–78).

*Luckey V,* however, does not foreclose all suits for prospective injunctive relief as it found distinguishable an unreported prospective injunctive relief case out of the Middle District of Alabama, *R.C. v. Hornsby,* no. 88-d-1170-n (M.D.Ala. April 19, 1989). *R.C.* sought relief to alleviate systemic constitutional violations in the foster care system for emotionally disturbed children. The *Luckey V* court held that the cause before it was disanalogous to *R.C.* as the *R.C.* district court had found that there was no state proceeding to be interfered with and the state's juvenile court lacked authority to consider the issues raised in the complaint. *Luckey V,* 976 F.2d at 677.

This Court must make the same determination as the *R.C.* and *Luckey V* courts. Thus, this Court examines the claims of the Plaintiffs in the instant case. Plaintiffs contend that they do not endeavor to stop any judicial proceedings or restrain any judicial officer. Their prayer for relief essentially includes:

1) certifying this action as a class;

2) declaring unconstitutional and unlawful practices violative of the Constitutional provisions and statutory provisions as set forth in the six count complaint including meeting the putative class members' basic needs, safety, freedom from harm and unreasonable restraints on liberty;

3) enjoining the Defendants from violating the Constitution and the laws;

4) appointing an expert panel to develop and oversee the implementation of a plan for reform;

---

**6.** The controversy in *Luckey* spawned five sets of opinions. The one discussed is referred to as *Luckey V* wherein the Eleventh Circuit summarily affirmed the district court's order that tracked Judge Edmonson's dissent in *Luckey v. Harris,* 896 F.2d 479 (11th Cir.1989) (*"Luckey II"*).

5) appointing a children's advocate to present the interests of Plaintiffs to the department and with whom state decision-makers will meet "regularly and frequently to attempt to resolve issues that affect individual or groups of similarly situated foster children;"

6) award of attorneys' fees and other relief as the Court sees fit.

*See* Am.Compl. at p. 110–13. Plaintiffs argue that none of the relief sought will interfere in a state court's decision-making concerning any child; they assert that they seek relief against the Department only.

Defendants counter by claiming that any action this Court takes will impermissibly affect state circuit court proceedings pursuant to Florida Statute Chapter 39, Proceedings Related to Children. As the allegations in the Amended Complaint and the Prayer for Relief do not have so obvious an effect on the state courts as in *O'Shea* and *Luckey V,* this Court must examine the jurisdiction and reach of the state dependency court and determine whether the relief sought in this case would result in the type of impermissible conflict that the *Younger* doctrine is designed to prevent.

After the petition for dependency made by the Department pursuant to Fla.Stat. § 39.521 (2001), the circuit court holds a disposition hearing if the court finds the facts alleged in the petition were proven by a preponderance of the evidence in an adjudicatory hearing. Fla.Stat. § 39.507 (2001). At the disposition hearing, the Department must prepare a written case plan and a predisposition study. Fla.Stat. § 39.521(1). The case plan must be filed with the court, Fla.Stat. § 39.601(2) (2001), and the plan must be approved by the court or the court must set a hearing within thirty days of the disposition hearing to review and approve the case plan. Fla.Stat. § 39.521(1)(a).

The requirements of a case plan are set forth in Fla.Stat. § 39.601 (2001). In essence the case plan must be reasonable and accessible to the parent, any court appointed guardian *ad litem,* and where appropriate, the child. Fla.Stat. § 39.601(1). The case plan must set forth the number of meetings per month between the Department and the parent and must be subject to modification for changing circumstances. *Id.* The plan must describe the problems, and how the parent can comply with the plan under measurable objectives to address the problems. Fla.Stat. § 39.601(2). The case plan filed before the court *inter alia* must include a permanency goal, the description of the home or institution in which the child is to be placed, the financial obligations of the parent, the parent's visitation rights, the safety and appropriateness of the placement, and the stability of the educational process. Fla.Stat. § 39.601(3). Once the case plan has been approved by the court, the court retains jurisdiction, and the plan subject to judicial review at least every six months. Fla.Stat. § 39.701(1) (2001).

Heeding this statutory scheme, Plaintiffs assert that they seek to affect those matters beyond the reach of the state dependency courts. In terms of the three *Middlesex* factors, Plaintiffs concede that the second *Middlesex* factor, whether an important state interest is implicated, is met given importance of administering the state dependency proceedings. Each group of claims, therefore, will be examined in terms of the first *Middlesex* prong, whether there is an ongoing state judicial proceeding, and the third prong, whether there is an adequate opportunity in the state proceedings to raise the claims.

Plaintiffs' claims revolve around the limitations of the juvenile court. These include the juvenile court's inability to select specific placements, to order specific treat-

ments or services, to order the creation of certain services, to reject an unsafe placements, to remove a child from an unsafe placement without discharging the child from the Department's custody or order a different level of placement, to enjoin injurious practices of the Department, to require the Department to produce a better array of placement options, to affect the management of the Department's resources, and Plaintiffs' inability to bring a class action complaint before the juvenile court. Plaintiffs also claim that the jurisdiction of the juvenile courts does not extend to individuals in extended foster care pursuant to Fla.Stat. § 409.145 (2001), and that the juvenile courts are unable to mandate compliance with federal statutory and to prevent the violation of constitutional rights. As grounds Plaintiffs cite to *Dep't. of Children and Family Services v. I.C.,* 742 So.2d 401, 404 (Fla. 4th DCA 1999), where the court held, "The court cannot 'micro manage' a facility operated by DCF. . . . Nor, can the court order DCF to provide specific treatment or placement of a child." *See also In the Interest of L.W.,* 615 So.2d 834, 838 (Fla. 4th DCA 1993) (dependency court had no ability to order specific placement); *State ex rel. Dep't. of Health and Rehabilitative Servs. v. Brooke,* 573 So.2d 363 (Fla. 1st DCA 1991) (holding same).

Excepting for the time being those individuals in extended foster care, there is no dispute that the state dependency court has continuing jurisdiction over dependent children conferred by Fla.Stat. § 39.701. A dependent child is under the jurisdiction of the dependency court from the moment the Department petitions for dependency (and would become a putative class member) until the child is deemed to be no longer dependent. *See* Am.Compl. ¶ 117 ("The class consists of all children who are currently or will be in the custody of Defendants as an alleged or adjudicated dependent child."). The state court obtains jurisdiction in the disposition hearing, must approve a case plan, and thereafter retains jurisdiction and conducts periodic judicial review once the case plan has been approved by the court. Fla.Stat. §§ 39.507, 39.521, & 39.701(1); *see also In the Interest of L.W.,* 615 So.2d at 838 ("In [dependency] proceedings . . ., there is a continuing statutory duty of judicial review."); *Henry & Rilla White Foundation, Inc. v. Migdal,* 720 So.2d 568, 571–72 (Fla. 4th DCA 1998) (holding same). At such point the actions of the Department are before the state circuit court for review. There is no point in this process where actions of the Department concerning any child are beyond the review of the state court. Any order of this Court, therefore, has the potential for an unseemly conflict between a state judge and this Federal Court. *See Luckey V,* 976 F.2d at 679; *c.f. J.P. v. DeSanti,* 653 F.2d 1080, 1084 (6th Cir.1981) (it was error under *Younger* to enjoin the use of social histories prepared by state probation authorities for juvenile adjudicatory hearings); *Joseph A. v. Ingram,* 262 F.3d 1113, 1126 (10th Cir.2001) (prohibiting on *Younger* grounds the enforcement of the settlement agreement likened to an injunction as it required interference with the operations of the juvenile court by preventing the child services department from recommending a range of planning options for children who are in the department's custody). In light of the continuing jurisdiction conferred by Fla.Stat. § 39.701, Plaintiffs cannot argue that the first *Middlesex* prong requiring an ongoing state judicial proceeding is not met due to the retention of jurisdiction and periodic judicial review once the case plan has been approved by the court. Fla.Stat. § 39.701(1); *see also In the Interest of L.W.,* 615 So.2d at 838 ("In [dependency] proceedings . . ., there is a continuing statutory duty of judicial review."); *Henry & Rilla White Founda-*

*tion, Inc. v. Migdal,* 720 So.2d 568, 571–72 (Fla.App. 4th Dist.1998) (holding same).

All complaints concerning Chapter 39 alleged or adjudicated dependent children, therefore, rise and fall on the third *Middlesex* prong, whether there is an adequate opportunity to raise their claims in the state proceedings. *Middlesex,* 457 U.S. at 432, 102 S.Ct. at 2521. The plaintiff bears the burden to establish that state procedures are inadequate. *Butler v. Alabama Judicial Inquiry Comm.,* 261 F.3d 1154, 1159 (11th Cir.2001) (*"Butler II"*). "Minimal respect for the state processes, of course, precludes any *presumption* that the state courts will not safeguard federal constitutional rights." *Middlesex,* 457 U.S. at 431, 102 S.Ct. at 2521. The burden "rests on the federal plaintiff to show that state procedural law barred presentation of [its] claims." *Pennzoil v. Texaco, Inc.,* 481 U.S. 1, 14, 107 S.Ct. 1519, 1528, 95 L.Ed.2d 1 (1987) (citations omitted). The *Pennzoil* Court determined:

> We cannot assume that state judges will interpret ambiguities in state procedural law to bar presentation of federal claims. Accordingly, when a litigant has not attempted to present his federal claims in related state-court proceedings, a federal court should assume that state procedures will afford an adequate remedy in the absence of unambiguous authority to the contrary.

*Pennzoil,* 481 U.S. at 15, 107 S.Ct. at 1519 (internal citations omitted). Plaintiffs have produced no authority that explicitly states that the constitutional and the federal statutory claims cannot be raised before a dependency court. This Court, therefore, must examine the decisions of Florida's courts to determine whether it is unambiguous that the dependency court's authority does not include the ability to review the claims raised and afford an adequate remedy.

Both groups of litigants look largely to the same decisions from Florida's appellate courts in support of their arguments. In a suit over whether the state circuit judge in a dependency proceeding could order "a child permanently committed to HRS for adoption placement to be cared for in a therapeutic foster home or residential facility," Florida's Fourth District Court of Appeals examined in detail Florida's statutory scheme for dependency matters. *In the Interest of L.W.,* 615 So.2d at 835. The court began its analysis by quoting from § 39.001(2)(a) & (b) stating, "The Florida Juvenile Justice Act begins with the recitation of the legislative purposes which include: (a) To provide judicial and other procedures through which children and other interested parties are assured fair hearings and the recognition, *protection,* and *enforcement* of their constitutional and other legal rights...." *In the Interest of L.W.,* 615 So.2d at 837 (emphasis in original); *see also A.G. v. Dep't. of Children and Families,* 721 So.2d 414, 417 (Fla. 4th DCA 1998) (appellate court reversed dependency court for denying due process rights of litigants); *I.C.,* 742 So.2d at 405–6 (holding same). *In the Interest of L.W.* also determined, "we must conclude that the purpose of judicial review is to assure that the Department is complying with reasonable efforts to assure the protection of this child and to promote her adoptive placement as is the Department's duty." *Id.* at 838; *see also Henry & Rilla White Foundation, Inc.,* 720 So.2d at 573 ("The provisions of Chapter 39 provide a juvenile court judge the flexibility to factor a child's safety into a custody decision at all stages of a juvenile proceeding."). Far from being the unambiguous authority that is required of Plaintiffs, these cases rather clearly indicate that the federal constitutional claims relating to both the issue of child safety and due process can be raised in the dependency court hearing.

Plaintiffs are correct in asserting that the specific remedies they seek such as the inability of the juvenile court to select specific placements, order specific treatments, services, or the creation of certain services, to reject unsafe placements, and review of the budget choices of the Department are not available in the state circuit court. *See I.C.,* 742 So.2d at 404; *In the Interest of L.W.,* 615 So.2d at 838; *State ex rel. Dep't. of Health & Rehabilitative Servs.,* 573 So.2d at 363. The relevant question is not whether the state courts can do all that Plaintiffs wish they could, but whether the available remedies are sufficient to meet *Pennzoil's* requirement that the remedy be adequate. *See Pennzoil,* 481 U.S. at 15, 107 S.Ct. at 1519.

Despite the limitations Plaintiffs describe, the *I.C.* court—perhaps Plaintiffs' strongest case—determined that "the juvenile court can act to protect children within its jurisdiction." *I.C.,* 742 So.2d at 404. The *I.C.* court looked to § 39.453(8)(g), which holds:

> The court may issue a protective order in assistance, or as a condition, of any other order made under this part. In addition to the requirements included in the case plan, the protective order may set forth requirements relating to reasonable conditions of behavior to be observed for a specified period of time by a person or agency who is before the court; and such order may require any such person or agency to make periodic reports to the court containing such information as the court in its discretion may prescribe.

*See also Henry & Rilla,* 720 So.2d at 573 (holding that Chapter 39 provides the juvenile judge the flexibility to factor a child's safety into a custody decision at all stages of a juvenile proceeding). Although Plaintiffs and their counsel, if they had designed the statutory scheme, may have chosen to vest the dependency court with the ability to more precisely manage each child before it, this Court declines to hold that the allowable remedies are inadequate. The legislature and the courts of Florida have clearly determined that the system in place leaves to the Department decisions which are properly its. *See I.C.,* 742 So.2d at 404–5. Holding otherwise would be antipathetic to established principles of comity. *O'Shea,* 414 U.S. at 501, 94 S.Ct. at 679.

The next question, therefore, is whether the lack of a class mechanism renders the dependency court inadequate for *Younger* purposes. Plaintiffs rely on *LaShawn A. v. Kelly,* 990 F.2d 1319 (D.C.Cir.1993), where the court determined that there was no pending judicial proceeding "which could have served as an adequate forum for the class of children in this case to present its multifaceted request for broad-based injunctive relief based on the Constitution and on federal and local statutory law." *Id.* at 1324. In *LaShawn A.,* however, after the court conducted an extensive review over the jurisdiction of the juvenile courts in the foster care setting, the court concluded that the state court "explicitly rejected the use of review hearings to adjudge claims requesting broad-based injunctive relief based on federal law." *Id.* at 1323. Although Florida's dependency courts similarly are not permitted to entertain a class action, *see I.C.,* 742 So.2d at 405–6, unlike the plaintiffs in *LaShawn A.,* there is no bar to Plaintiffs bringing constitutional claims. The issue that remains, therefore, is whether the lack of a class action mechanism renders the dependency proceedings inadequate.

In *Luckey V,* although the court did not explicitly discuss the lack of a class action mechanism in the state proceeding, nevertheless, the apparent deficiency did not prevent the court from abstaining under *Younger. Luckey V,* 976 F.2d at 677.

In *Pompey,* also a class action case, the court determined that abstention under *Younger* was appropriate because plaintiffs could have raised their claims during their contempt hearings, on appeal, or through *habeas corpus* relief. *Pompey,* 95 F.3d at 1551. The *Pompey* court found no procedural bar even though the state proceedings did not include a class mechanism. *Id.* In light of *Luckey V's* wariness to enter an injunction that would inevitably interfere with both ongoing and future state court procedures, it would be inappropriate to adjudicate the constitutional issues on a class wide basis in this forum and reach one result and then have a dependency court reach a contrary finding after examining the situation of a dependent youth on an individual basis. This is exactly the scenario that troubled the *Pompey* court and caused it to state, "Federal 'inferior courts' have no more business issuing supervisory injunctions to safeguard federal constitutional rights in state court proceedings than state courts have issuing such injunctions to safeguard federal constitutional rights in federal court proceedings." *Pompey,* 95 F.3d at 1550. Accordingly, in view of *Luckey V* and *Pompey,* the lack of a class remedy in and of itself does not render the state forum inadequate.

▮ Both the procedures in place under Chapter 39 and the appellate review of dependency court proceedings for due process violations necessitates abstention for Plaintiffs' procedural due process claim (Count 2). The ongoing jurisdiction and the ability of Plaintiffs to raise constitutional claims in dependency court mandates abstention for Plaintiffs' substantive due process claim (Count 1) and the claim under the First, Ninth, and Fourteenth Amendments (Count 3).

▮ As no reported case has been produced where Florida's state dependency courts have considered the federal statutory claims raised in the instant action, such claims are not barred under *Younger.* Accordingly, the remaining statutory claims, the Early and Periodic Screening, Diagnosis and Treatment claim (Count 5) and Title VI (Count 6) survive *Younger.* As juvenile jurisdiction is not extended to individuals in extended foster care pursuant to Fla.Stat. § 409.145, however, such claims are not barred by *Younger* as the first *Middlesex* prong is not met as there is no ongoing state proceeding. *See N.L. v. Dep't. of Children & Family Servs.,* 770 So.2d 220 (Fla. 3d DCA 2000); *L.Y. v. Dep't. of Health & Rehabilitative Servs.,* 696 So.2d 430, 431 (Fla. 4th DCA 1997). Accordingly, *Younger* does not mandate abstention from hearing claims of individuals in extended foster care pursuant to Fla.Stat. 409.145.

## C. *Rooker–Feldman* Doctrine

▮ The *Rooker–Feldman* doctrine limits the subject matter jurisdiction of the federal courts over certain matters related to previous state court litigations. *Goodman v. Sipos,* 259 F.3d 1327, 1332 (11th Cir.2001). The Eleventh Circuit in *Siegel v. Lepore,* 234 F.3d 1163 (11th Cir.2000) stated:

> The *Rooker–Feldman* doctrine provides that federal courts, other than the United States Supreme Court, have no authority to review the final judgments of state courts. *See District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462, 486, 103 S.Ct. 1303, 1317, 75 L.Ed.2d 206 (1983); *Rooker v. Fidelity Trust Co.,* 263 U.S. 413, 415–16, 44 S.Ct. 149, 150, 68 L.Ed. 362 (1923). The doctrine extends not only to constitutional claims presented or adjudicated by a state court, but also to claims that are "inextricably intertwined" with a state court judgment. *Feldman,* 460 U.S. at 482 n. 16, 103 S.Ct. at 1315 n. 16; *Dale*

*v. Moore,* 121 F.3d 624, 626 (11th Cir. 1997).

*Siegel,* 234 F.3d at 1172. Even if a claim is "inextricably intertwined" with a state court's judgment, however, the doctrine does not apply if a plaintiff had no reasonable opportunity to raise the issue in the state court. *Goodman,* 259 F.3d at 1332; *Liedel v. Juvenile Court of Madison County,* 891 F.2d 1542, 1545 n. 4 (11th Cir.1990). The *Goodman* court held that the *Rooker–Feldman* doctrine is easily applicable where "the primary relief sought . . . [is] an injunction preventing enforcement of the state court judgment and returning custody to the aggrieved parent." *Goodman,* 259 F.3d at 1333. Where, however, "the plaintiffs are not seeking injunctive relief that would prevent the enforcement of any child custody orders of the state court, *Rooker–Feldman* is inapplicable." *Id.*

 Many of *Rooker–Feldman's* concerns mirror *Younger's* issues and the parties have argued *Rooker–Feldman* in nearly identical fashion. The remaining two statutory claims: Early and Periodic Screening, Diagnosis and Treatment claim (Count 5) and Title VI (Count 6) survive *Rooker–Feldman* as well as Defendants have pointed to no final determination that this Court would be reviewing or proceeding that would be enjoined by a determination of the issues remaining before the Court. Similarly, the claims of individuals in extended foster care survive as well.

**D. Interpreting *Alexander v. Sandoval***

On April 23, 2001, days after Magistrate Judge Dubé entered his report and recommendation, the Supreme Court handed down its decision in *Alexander v. Sandoval,* 532 U.S. 275, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001). *Sandoval* is reviewed separately as it potentially impacts a number of the claims in Plaintiffs' Amended Complaint.

The subject of the litigation in *Sandoval* was Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.* prohibiting racial discrimination in federally funded programs. Section 601 holds, "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C.2000d. The Court ultimately concluded that claims brought under § 601 for intentional discrimination "are covered by the cause of action to enforce that section." *Sandoval,* 532 U.S. 275, 121 S.Ct. at 1518.

Section 602 states that federal agencies are authorized "to effectuate provisions of . . . [§ 601 of title VI] with respect to such program or activity by issuing rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute. . . ." 42 U.S.C. § 2000d–1. The Supreme Court examined whether there is a private cause of action to enforce the regulation issued by the Department of Justice that forbids federal funding recipients from utilizing "criteria or methods of administration which have the effect of subjecting individuals to discrimination because of their race, color, or national origin. . . ." 28 CFR § 42.104(b)(2) (1999).

The *Sandoval* court began with the proposition that private rights of action to enforce federal law must be created by Congress. *Sandoval,* 121 S.Ct. at 1519 (citing *Touche Ross & Co. v. Redington,* 442 U.S. 560, 578, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979)). "The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy." *Sandoval,* 121 S.Ct. at 1519 (citing *Transamerica Mort-*

*gage Advisors, Inc. v. Lewis,* 444 U.S. 11, 15, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979)).

The *Sandoval* Court rejected *Lau v. Nichols,* 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974) (holding that § 601 prohibits disparate impact discrimination) and held that disparate-impact regulations reach beyond § 601 by forbidding conduct that § 601 permits. *Sandoval,* 121 S.Ct. at 1519. According to *Sandoval,* conduct that § 601 does not forbid, that is conduct in violation only of the disparate impact regulations, must derive its force from § 602 if from anywhere. *See id.* Stated differently, disparate impact regulations, which reach beyond § 601's directives, cannot create a private right of action standing alone, they depend on what Congress intended in creating § 602.

The *Sandoval* Court therefore turned to the text of § 602 to determine if it provided "rights-creating" language as § 601 clearly did. *Sandoval,* 121 S.Ct. at 1521. While § 602 authorizes agencies to pass regulations detailing means of compliance with the directives of Title VI and their enforcement, the Court determined that "rights-creating" language "is completely absent from § 602." *Id.* Since disparate impact regulations reach beyond the letter of § 601, which prohibits only intentional discrimination, the Court held that no pri-

vate right existed to bring a suit under the Justice Department's disparate impact regulation, and the methods provided in § 602 for enforcing its regulations do not create a private remedy. *Id.* The Court concluded that there was no Congressional intent to create a "freestanding private right of action to enforce regulations promulgated under § 602," and, therefore, "no such right of action exists." *Id.* at 1523.

In its majority opinion, the *Sandoval* Court did not address whether a suit utilizing 42 U.S.C. § 1983 could be brought for a violation of regulations passed pursuant to § 602. In his dissent, Justice Stevens stated, "Litigants who in the future wish to enforce the Title VI regulations against state actors in all likelihood must only reference § 1983 to obtain relief; indeed, the plaintiffs in this case (or other similarly situated individuals) presumably retain the option of re-challenging Alabama's English-only policy in a complaint that invokes § 1983 even after today's decision." *Sandoval,* 121 S.Ct. at 1527 (Stevens, J., dissenting). Only a handful of district courts have of yet engaged in a detailed analysis of *Sandoval.*[7] Few district courts have thoroughly analyzed *Sandoval* in a suit brought pursuant to 42 U.S.C. § 1983 based on disparate impact regulations issued pursuant to § 602.[8] This Court has

7. The Eleventh Circuit in *Johnson v. Bd. of Regents of the Univ. of Georgia,* 263 F.3d 1234 (11th Cir.2001) cited *Sandoval* in support of its holding that the district court committed no error in denying Plaintiffs' motion to amend their complaint and add a claim for disparate impact discrimination based on Department of Education regulations promulgated under § 602.

8. Noteworthy among the district court cases are the following. In *South Camden Citizens in Action v. New Jersey Dep't. of Envtl. Prot.,* 145 F.Supp.2d 505 (D.N.J.2001), the district court had issued an injunction and declaratory judgment against the commissioner of the state's environmental protection agency for issuing air permits that the court determined

had a disparate impact in violation of the regulations passed pursuant to § 602 by the Environmental Protection Agency. When the *Sandoval* decision was issued, the district court set a briefing schedule and evaluated whether plaintiffs were entitled to the injunction under § 1983 for the violation of the federal regulations. Taking a cue from Justice Stevens's dissent in *Sandoval,* the *South Camden* court determined that *Sandoval* did not preclude § 1983 actions, even those brought under § 602 of Title VI. After a lengthy analysis of whether regulations passed pursuant to § 602 could create a federal right actionable under § 1983; *South Camden,* 145 F.Supp.2d at 516–20, the district court applied the *Wilder–Blessing* analysis and determined that the injunction could be up-

found no reported case that has applied *Sandoval* to ASFA and Medicaid.

▮▮▮▮▮▮ The question remains, therefore, as to whether a plaintiff suing one under § 1983's cause of action can do so for a violation of the regulations promulgated pursuant to § 602. Clearly where there is a freestanding private right of action there is no necessity for invoking § 1983's private right of action. Where an enforceable private right of action has been found, a "federal right" necessarily exists as required by the Supreme Court in *Wilder v. Virginia Hosp. Assn.*, 496 U.S. 498, 509, 110 S.Ct. 2510, 2517, 110 L.Ed.2d 455 (1990) and *Blessing v. Freestone*, 520 U.S. 329, 340, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997). Where, however, no private right of action exists outside of § 1983, a court must evaluate whether the statute creates a "federal right." Of course, a determination of this question impacts the claims brought alleging violations of other statutes that either do not or do not clearly embrace a private right of action.

This Court, therefore, must determine whether the disparate impact claim brought pursuant to § 1983's private right of action survives *Sandoval*. Similarly, this Court must decide whether the counts brought pursuant to the remaining statuto-ry cause of action, the Early and Periodic Screening, Diagnosis and Treatment Provisions of the Medicaid Title ("EPSDT"), 42 U.S.C. §§ 1396a(a)(43) and 1396d(r) are privately enforceable against Defendants.

### E. Section 1983

Section 1983 imposes liability on anyone who, acting under color of state law, deprives a person of "any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. The Supreme Court has held that section 1983 can be used to vindicate violations of federal statutory rights. *Maine v. Thiboutot*, 448 U.S. 1, 4–8, 100 S.Ct. 2502, 2504–06, 65 L.Ed.2d 555 (1980); *see also Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 105, 110 S.Ct. 444, 448, 107 L.Ed.2d 420 (1989) ("As the language of the statute plainly indicates, the remedy encompasses violations of federal statutory as well as constitutional rights.").

### 1. Genesis of a Federal Right

As the Supreme Court held in *Blessing v. Freestone*, 520 U.S. 329, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997):

> In order to seek redress through § 1983, however, a plaintiff must assert the violation of a federal right, not merely a violation of federal law. We have

---

held under § 1983. *South Camden*, 145 F.Supp.2d at 524–49; *see generally Wilder v. Virginia Hosp. Assn.*, 496 U.S. 498, 509, 110 S.Ct. 2510, 2517, 110 L.Ed.2d 455 (1990); *Blessing v. Freestone*, 520 U.S. 329, 340, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997). See also *Frederick L. v. Dep't. of Public Welfare*, 157 F.Supp.2d 509, 533–34 (E.D.Pa.2001) (actions brought under Title II of the ADA and the Rehabilitation Act were permissible under § 1983); *Access Living of Metro. Chicago v. Chicago Transit Auth.*, No. 00C0770, 2001 WL 492473 (N.D.Ill. May 9, 2001) (holding Plaintiffs had stated a claim for intentional discrimination under the ADA and § 504).

*Lucero v. Detroit Pub. Sch.*, 160 F.Supp.2d 767 (E.D.Mich.2001) contains a rather de-tailed discussion of *Sandoval* and § 1983. In *Lucero*, the district court concluded that there was a private right enforceable under § 1983 for violations of regulations passed pursuant to § 602. The *Lucero* court, however, resides in the Sixth Circuit, which has a more liberal standard regarding whether federal rights can stem from regulations to uphold § 1983 claims. *See Loschiavo v. City of Dearborn*, 33 F.3d 548, 554 (6th Cir.1994) (holding federal regulations have the force of law and may create enforceable rights); *but see Harris v. James*, 127 F.3d 993, 1009 (11th Cir.1997) (holding Congress must unambiguously confer federal rights on the plaintiff).

traditionally looked at three factors when determining whether a particular statutory provision gives rise to a federal right. First, Congress must have intended that the provision in question benefit the plaintiff. Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so "vague and amorphous" that its enforcement would strain judicial competence. Third, the statute must unambiguously impose a binding obligation on the States. In other words, the provision giving rise to the asserted right must be couched in mandatory, rather than precatory, terms.

*Blessing*, 520 U.S. at 340–41, 117 S.Ct. at 1359–60 (citations omitted); *see also Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 509, 110 S.Ct. 2510, 2517, 110 L.Ed.2d 455 (1990) ("Such an inquiry turns on whether the provision in question was intended to benefit the putative plaintiff. If so, the provision creates an enforceable right unless it reflects merely a congressional preference for a certain kind of conduct rather than a binding obligation on the governmental unit, or unless the interest the plaintiff asserts is too vague and amorphous such that it is beyond the competence of the judiciary to enforce.") (citations omitted).

 There is a split in the circuits over whether a "federal right" can stem from a regulation. The Eleventh Circuit, however, has unequivocally spoken to this issue and such determination is binding on this Court. The Eleventh Circuit has held that federal rights must ultimately emanate from either explicit or implicit statutory requirements and not solely from a regula-

tion. *Harris v. James*, 127 F.3d 993, 1009 n. 21 (11th Cir.1997); *see also Doe v. Chiles*, 136 F.3d 709, 713 (11th Cir.1998) (noting the prior Eleventh Circuit rejection of the notion of finding enforceable rights in any valid administrative interpretation of a statute that creates some enforceable right). The *Harris* court stated:

> [I]f the regulation defines the content of a statutory provision that creates no federal right under the three-prong test, or if the regulation goes beyond explicating the specific content of the statutory provision and imposes distinct obligations in order to further the broad objectives underlying the statutory provision, we think the regulation is too far removed from Congressional intent to constitute a "federal right" enforceable under § 1983.

*Harris*, 127 F.3d at 1009. The *Harris* court determined that Supreme Court precedent requires "Congressional intent to create federal rights" and had directed that "courts must find that Congress has unambiguously conferred federal rights on the plaintiff." *Id.* (citing *Suter v. Artist M.*, 503 U.S. 347, 357, 112 S.Ct. 1360, 1367, 118 L.Ed.2d 1 (1992); *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 18, 24–25, 101 S.Ct. 1531, 1540, 1543–44, 67 L.Ed.2d 694. (1981)).[9]

## 2. Is Private Enforcement Foreclosed by a Remedial Scheme

Just prior to *Blessing*, the Eleventh Circuit in *Maynard v. Williams*, 72 F.3d 848, 852 (11th Cir.1996) held, "(1) For an action to be cognizable under § 1983, it is not enough that the conduct in question mere-

---

9. Not only are the Eleventh Circuit decisions wholly in line with Supreme Court precedent, they foreshadow the Supreme Court's decision in *Sandoval* where the Court held, "Language in a regulation may invoke a private right of action that Congress through statutory text created, but it may not create a right that Congress has not." *Sandoval*, 121 S.Ct. at 1522. Furthermore, *Sandoval* held, "But it is most certainly incorrect to say that language in a regulation can conjure up a private cause of action that has not been authorized by Congress." *Id.*

ly violates federal law—that violation must trammel a 'right' secured by federal law; (2) Even if the statute in question creates such a right, a private right of action under § 1983 may still be unavailable if Congress has foreclosed private enforcement in the enactment of the statute through the inclusion of sufficiently comprehensive remedial devices." (citing *Wehunt v. Ledbetter*, 875 F.2d 1558, 1563 (11th Cir.1989); *Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 20–21, 101 S.Ct. 2615, 2626–27, 69 L.Ed.2d 435 (1981)). This second inquiry—whether private enforcement has been foreclosed because of a remedial scheme is apparent in *Blessing* and subsequent Supreme Court decisions as well. *Blessing* held, "Even if a plaintiff demonstrates that a federal statute creates an individual right, there is only a rebuttable presumption that the right is enforceable under § 1983. Because our inquiry focuses on congressional intent, dismissal is proper if Congress specifically foreclosed a remedy under § 1983." *Blessing*, 520 U.S. at 340–41, 117 S.Ct. at 1359–60 (citations and internal quotations omitted); *see also Alexander v. Sandoval*, 531 U.S. 1049, 121 S.Ct. 1511, 1522 (2001) ("And as our Rev.Stat. § 1979, 42 U.S.C. § 1983 cases show, some remedial schemes foreclose a private cause of action to enforce even those statutes that admittedly create substantive private rights.") (citation omitted).

The questions, then, for this Court are, first, whether the statutes at issue create federal rights enforceable under § 1983. Second, where a regulation is involved, whether the regulations reach beyond the specific content of the statute and imposes a distinct obligation to be enforceable. Finally, even where a substantive federal right exists, whether Congress has foreclosed enforcement through a remedial scheme.

### F. Title VI—Disparate Impact Regulations

The Amended Complaint does not separate claims for intentional discrimination, brought pursuant to § 601, from those brought for disparate impact. The intentional discrimination claims clearly survive. *See Sandoval*, 121 S.Ct. at 1518 ("We do not doubt that regulations applying § 601's ban on intentional discrimination are covered by the cause of action to enforce that section."). The disparate impact claim, however, presents a thornier issue. Notwithstanding Justice Stevens's dissent in *Sandoval* and the opinions of other district courts that have reckoned with *Sandoval*, the *Sandoval* majority's analysis, in the opinion of this Court, precludes the enforcement of disparate impact regulations under § 1983 in light of prior Supreme Court and Eleventh Circuit precedent, specifically *Blessing v. Freestone*, 520 U.S. 329, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997) and *Harris v. James*, 127 F.3d 993 (11th Cir.1997).

Under *Harris* no "federal right" exists to be enforced under § 1983 where a regulation "defines the content of a statutory provision that creates no federal right under [*Blessing's* ] three-prong test" or "goes beyond explicating the specific content of the statutory provision and imposes distinct obligations. . . ." *Harris v. James*, 127 F.3d 993, 1009 (11th Cir.1997). The Supreme Court held in *Sandoval* that disparate impact regulations do not derive their force from § 601, but rather from § 602. *Sandoval*, 121 S.Ct. at 1519. *Sandoval* also held that § 602 does not contain any "rights-creating" language. *Id.* at 1521 ("It is immediately clear that the 'rights-creating' language so critical in the Court's analysis in *Cannon* of § 601, . . . is completely absent from § 602."). The *Sandoval* Court also determined that:

Section 602... focuses neither on the individuals protected nor even on the funding recipients being regulated, but on the agencies that will do the regulating. Like the statute found not to create a right of action in *Universities Research Assn., Inc. v. Coutu,* 450 U.S. 754, 101 S.Ct. 1451, 67 L.Ed.2d 662 (1981), § 602 is "phrased as a directive to federal agencies engaged in the distribution of public funds," *id.,* at 772, 450 U.S. 754, 101 S.Ct. 1451, 67 L.Ed.2d 662. *Sandoval,* 121 S.Ct. at 1521. As § 602 does not contain any "rights-creating" language and focuses on the agencies rather than individuals, a regulation that creates rights for individuals—such as the disparate impact regulations passed pursuant to § 602—necessarily imposes distinct obligations beyond the specific content of the statute. Under *Harris,* such regulations cannot be enforced privately through 1983.

Putting *Harris* aside, this result is also correct on different grounds. Of course, Congressional intent is determinative on whether a private right and private remedy exists. *Sandoval,* 121 S.Ct. at 1519. The Supreme Court has already determined that no freestanding private right of action exists for disparate impact regulations. *Id.* at 1523. To hold that these same regulations are enforceable under § 1983 would be equivalent to holding that while Congress did not intend § 602 regulations to be enforceable against private entities, it intended them to be enforceable against state actors. Regardless of whether one deems *Sandoval* to have been correctly decided, there is no evidence that Title VI should be interpreted differently against state actors.

Additionally, both *Maynard* and *Blessing* have determined that, notwithstanding whether a substantive private right exists, a private right of action under § 1983 may still be unavailable if private enforcement has been foreclosed by Congress through sufficiently comprehensive remedial devices. *Maynard,* 72 F.3d at 852; *Blessing,* 520 U.S. at 340–41, 117 S.Ct. at 1359–60; *see also Sandoval,* 121 S.Ct. at 1522 (stating that in the § 1983 context some remedial schemes foreclose a private cause of action to enforce even where those statutes create substantive private rights) (citing *Middlesex,* 453 U.S. 1, 101 S.Ct. 2615). The *Sandoval* Court did not reach the question of whether § 602's remedial scheme forecloses private enforcement. The Court, however, did indicate that § 602 seemed to create a remedial scheme that would foreclose private enforcement of regulations passed pursuant to its authority. *Sandoval,* 121 S.Ct. at 1521 ("Nor do the methods that § 602 goes on to provide for enforcing its authorized regulations manifest an intent to create a private remedy; if anything, they suggest the opposite.... Whatever these elaborate restrictions on agency enforcement may imply for the private enforcement of rights created outside of § 602, ... they tend to contradict a congressional intent to create privately enforceable rights through § 602 itself.") (citations omitted). This Court does not reach whether § 602's remedial scheme forecloses private enforcement, for as previously determined by reading *Sandoval in pari materia* with *Harris,* the disparate impact regulations do not contain a substantive private right. Therefore, Defendants' motion to dismiss is GRANTED as to Plaintiffs disparate impact regulations, however, under *Sandoval* Defendants' motion to dismiss on the intentional discrimination claim is DENIED.

**G. Medicaid Act—Early and Periodic Screening, Diagnosis and Treatment**

██ "Medicaid is a cooperative federal-state program through which the Federal Government provides financial assistance to States so that they may furnish medical care to needy individuals." *Wilder v. Vir-*

*ginia Hosp. Ass'n,* 496 U.S. 498, 502, 110 S.Ct. 2510, 2513, 110 L.Ed.2d 455 (1990). Participation in the program is voluntary, but once a state chooses to participate, it must comply with certain requirements imposed by the Medicaid Act and regulations promulgated by the Secretary of HHS. *See Wilder,* 496 U.S. at 502, 110 S.Ct. at 2513; *Doe v. Chiles,* 136 F.3d 709, 714 (11th Cir.1998); *Tallahassee Memorial Regional Medical Center v. Cook,* 109 F.3d 693, 698 (11th Cir.1997) (per curiam). Florida has elected to do so. *Doe,* 136 F.3d at 714; Fla.Stat. § 409.904(3). Plaintiffs bring this cause of action asserting there is a right enforceable under § 1983 based on 42 U.S.C. § 1396a(a)(43). The Court notes that *Harris's* holding that a right cannot emanate solely from a regulation and impose a distinct obligation does not impact Plaintiffs' Early and Periodic Screening, Diagnosis and Treatment ("EPSDT") claim which is grounded in a statute. *See Harris v. James,* 127 F.3d 993, 1009 (11th Cir.1997).

The first factor for the Court to address is whether Congress has "intended that the provision in question benefit the plaintiff." *Blessing v. Freestone,* 520 U.S. 329, 340–41, 117 S.Ct. 1353, 1359–60, 137 L.Ed.2d 569 (1997). Section 1369a(a)(43) provides for:

(A) informing all persons in the State who are under the age of 21 and who have been determined to be eligible for medical assistance ... of the availability of early and periodic screening, diagnostic, and treatment services as described in section 1396d(r) of this title and the

need for age-appropriate immunizations against vaccine-preventable diseases,

(B) providing or arranging for the provision of such screening services in all cases where they are requested,

(C) arranging for (directly or through referral to appropriate agencies, organizations, or individuals) corrective treatment the need for which is disclosed by such child health screening services....

42 U.S.C. § 1396a(a)(43). The plain language of § 1396a(a)(43) is that all eligible persons in the state under the age of twenty-one receive increased healthcare services. *See DaJour B. v. City of New York,* No. 00 Civ. 2044(JGK), 2001 WL 830674, at * 8 (S.D.N.Y. July 23, 2001). Eligibility is determined by 42 U.S.C. §§ 1396a(a)(10)(A) & 1396d(a)(4)(B) and includes foster children. *Id.* The federal right conferred on eligible children under the age of twenty-one emanating from these subsections of § 1396a(a)(43) meets the first *Blessing* factor as it is sufficiently intended to benefit eligible individuals. *See Doe v. Chiles,* 136 F.3d at 715; *DaJour B.,* 2001 WL 830674, at * 8.

Next, the Plaintiffs must demonstrate that the right "assertedly protected by the statute is not so 'vague and amorphous' that its enforcement would strain judicial competence." *Blessing,* 520 U.S. at 340–41, 117 S.Ct. at 1359–60. In this context, this Court must determine whether it has the institutional competence to enforce a foster child's right (1) to be informed of the availability of early and periodic screening, diagnostic, and treatment services (as provided by § 1396d(r)(1)–(5)) [10]

---

**10.** Section 1396d(r)(1)–(5) holds:

The term "early and periodic screening, diagnostic, and treatment services" means the following items and services:

(1) Screening services—

(A) which are provided—

(i) at intervals which meet reasonable standards of medical and dental practice, as determined by the State after consultation

with recognized medical and dental organizations involved in child health care and, with respect to immunizations under subparagraph (B)(iii), in accordance with the schedule referred to in section 1396s(c)(2)(B)(i) of this title for pediatric vaccines, and

(ii) at such other intervals, indicated as medically necessary, to determine the exis-

and the need for appropriate immunizations; (2) to be provided with such screening services when requested; and (3) to have arranged necessary corrective treatment for the specific services. *See e.g., Doe,* 136 F.3d at 716.

Defendants rely heavily on *Charlie H. v. Whitman,* 83 F.Supp.2d 476, 499 (D.N.J. 2000). That court examined EPSDT and drew parallels to Title IV–D of the Social Security Act—the statute deemed to be too vague by the *Blessing* Court. *Id.* Focusing on 1396d(r) alone, the *Charlie H.* court determined that "the right to receive any and all treatments deemed necessary" was too vague for judicial enforcement. *Id.* Plaintiffs in the instant case allege that Defendants, who are bound to comply with the Medicaid Act, are not providing the services required by § 1396a(a)(43) and specifically defined by § 1396d(r) at all. Plaintiffs are not asking this Court to review what treatments are necessary or whether the state has made a bad policy decision, but whether the information, screening services, and necessary corrective treatment as determined by the state itself have been provided. Guaranteeing the rights under § 1396a(a)(43) of a foster child for the provision of the specific medical services listed in 42 U.S.C. § 1396d(r) is not outside the judicial competence. *See DaJour B.,* 2001 WL 830674, at * 10; *Frew v. Gilbert* 109 F.Supp.2d 579, 600–13, *Salazar v. District of Columbia,* 954 F.Supp. 278, 303–07 (D.D.C.1996).

The third *Blessing* factor requires this Court to examine whether § 1396a(a)(43) unambiguously imposes a binding obligation on the states. *Blessing,* 520 U.S. at 340–41, 117 S.Ct. at 1359–60. Section 1396a(a)(43) provides, "A State plan for medical assistance *must* ... provide for" informing children of the availability of the services provided by § 1396d(r)(1)–(5) and the need for appropriate immunizations, providing such screening services when requested, and arranging for necessary corrective treatment. *See* § 1396a(a)(43)(A–C) (emphasis added). Once a state accepts the funding, as Florida has, § 1396a is mandatory, rather than precatory. *See Doe,* 136 F.3d at 718.

These provision of § 1396a are sufficiently individualized, particularized, and mandatory under the *Blessing* test to support a § 1983 claim. *See DaJour B.,* 2001 WL 830674, at * 9. The Court also finds that the portion of *Maynard v.*

tence of certain physical or mental illnesses or conditions; and
(B) which shall at a minimum include—
(i) a comprehensive health and developmental history (including assessment of both physical and mental health development),
(ii) a comprehensive unclothed physical exam,
(iii) appropriate immunizations (according to the schedule referred to in section 1396s(c)(2)(B)(i) of this title for pediatric vaccines) according to age and health history,
(iv) laboratory tests (including lead blood level assessment appropriate for age and risk factors), and
(v) health education (including anticipatory guidance).
(2) Vision services—
... (B) which shall at a minimum include diagnosis and treatment for defects in vision, including eyeglasses.
(3) Dental services—
... (B) which shall at a minimum include relief of pain and infections, restoration of teeth, and maintenance of dental health.
(4) Hearing services—
... (B) which shall at a minimum include diagnosis and treatment for defects in hearing, including hearing aids.
(5) Such other necessary health care, diagnostic services, treatment, and other measures described in subsection (a) of this section to correct or ameliorate defects and physical and mental illnesses and conditions discovered by the screening services, whether or not such services are covered under the State plan.

*Williams,* 72 F.3d 848, 852 (11th Cir.1996), regarding the inclusion of sufficiently comprehensive remedial devices, does not foreclose enforcement under § 1983 for the same reasons that *Seminole Tribe* is inapplicable.

### H. Preclusion

There are three preclusion doctrines that often fall under the sweeping rubric of *"res judicata"* and are concerned with the preclusive effect of a prior adjudication. The first is "claim preclusion" or true *res judicata* and treats a judgment as the full measure of relief to be accorded between the same parties on the same claim or cause of action. Claim preclusion operates to avoid multiple suits on identical obligations between the same parties. *Allen v. McCurry,* 449 U.S. 90, 94, 101 S.Ct. 411, 414, 66 L.Ed.2d 308 (1980) ("Under *res judicata,* a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action.") (citing *Cromwell v. County of Sac,* 94 U.S. 351, 352, 24 L.Ed. 195 (1876)). The second is collateral estoppel or "issue preclusion." Issue preclusion bars the relitigation of issues actually adjudicated, and essential to the judgment, in a prior litigation between the same parties. *Allen,* 449 U.S. at 94, 101 S.Ct. at 414–15 ("Under collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case.") (citing *Montana v. U.S.,* 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979)).

Two cases previously filed and settled in the Southern District of Florida form the basis of Defendants' preclusion argument. The first is *Children A–F v. Chiles,* No. 90–2416–C.V.–KEHOE (S.D.Fla.) and the second is *M.E. v. Bush,*

No. 90–1008–C.V.–MOORE (S.D.Fla.). *A–F* involved identical allegations with the exception of two: Plaintiffs claim for violation of the First, Ninth, and Fourteenth Amendment and the claims for violation of Title VI. *A–F* was settled on February 27, 1995, and the case was dismissed with prejudice on July 24, 1995. It is undisputed that the claims of Plaintiffs that stem from actions that occurred prior to July 24, 1995, and those who were class members in *A–F* cannot raise those claims in this suit. It is also undisputed that those alleged violations occurring after the date the case was closed before Judge Kehoe are not precluded. Those claims that were litigated or could have been litigated in that suit regardless of whether the particular type of claim was raised by those plaintiffs before Judge Kehoe are barred under principles of *res judicata. See In re: Piper Aircraft,* 244 F.3d 1289, 1296 (11th Cir.2001) ("Under res judicata, also known as claim preclusion, a final judgment on the merits bars the parties to a prior action from re-litigating a cause of action that was or could have been raised in that action.") (citation omitted).

The recent approval of the settlement in *M.E.* on September 26, 2001 also invokes preclusion principles. The class in that suit includes "children who are now or in the future will be in the legal or physical custody of the State of Florida, including children who are dependent or delinquent, whom the State knows or should know have a need for mental health services." *M.E. v. Bush,* No. 90–1008, slip op. at 3 (S.D.Fla. Sept. 26, 2001). The type of claims covered include the "screening, assessing, service planning, and service delivery to class members while in the physical or legal custody of DCF or DJJ." *Id.* at Ex. A. ¶ 5. To avoid having overlapping classes such claims that involve mental health services are precluded. *See Prado–*

*Steiman v. Bush,* 221 F.3d 1266, 1282 (11th Cir.2000).

## I. Adequacy of the Amended Complaint

In *Anderson v. Dist. Bd. of Trustees of Centr. Florida Comm. Coll.,* 77 F.3d 364, 366–7 (11th Cir.1996), the court, concerned about the ramifications of cases proceeding on the basis of "shotgun" pleadings, noted:

> Experience teaches that, unless cases are pled clearly and precisely, issues are not joined, discovery is not controlled, the trial court's docket becomes unmanageable, the litigants suffer, and society loses confidence in the court's ability to administer justice.

*See also Magluta v. Samples,* 256 F.3d 1282 (11th Cir.2001); *Cesnik v. Edgewood Baptist Church,* 88 F.3d 902, 905 (11th Cir.1996); *L.S.T., Inc. v. Crow,* 49 F.3d 679, 684 (11th Cir.1995). Such "shotgun" pleading imperils fundamental principles of due process.

The Eleventh Circuit has expressed increased frustration with district courts that let the case proceed despite such shotgun pleadings. *See Byrne v. Nezhat,* 261 F.3d 1075, 1130 (11th Cir.2001). The *Byrne* court sought to avoid having district courts undergo the time-consuming process of "rearranging the pleadings and discerning whether the plaintiff has stated a claim, or claims, for relief, and whether the defendant's affirmative defenses are legally sufficient." *Id.* at 1129. The *Byrne* panel also counseled, "Shotgun pleadings, if tolerated, harm the court by impeding its ability to administer justice. The time a court spends managing litigation framed by shotgun pleadings should be devoted to other cases waiting to be heard." *Id.* at 1131.

With this admonition in mind, the Court turns its attention to the 116–page complaint at issue. Pages 3 through 49 contain a narrative account of the history of each Plaintiff that reads like a closing argument and violates Fed.R.Civ.P. 8's mandate that the complaint contain "a short and plain statement of the claim." Pages 60 through 88 contain a sprawling exposition of alleged violations of the substantive due process rights of the Plaintiffs. The next seven pages are dedicated to procedural due process violations, two then are devoted to violations of the First, Ninth, and Fourteenth Amendments, two pages for ASFA, followed by a page and a half on the EPSDT, then finally three and a half pages on violations of Title VI. On page 104 Plaintiffs finally outline their six causes of action and seek to incorporate into these causes of action paragraphs 1 through 137 and 139 through 217 (leaving out only paragraphs 138, 218, and 219). Plaintiffs' prayer for relief begins on page 110 and spills over onto page 113 by two lines. Accordingly, Plaintiffs are directed to file a second amended complaint that complies with the Federal Rules of Civil Procedure and this order as set forth below.

## Conclusion

It is adjudged that Plaintiffs' claim under Adoption and Safe Families Act (Count 4) is barred under the Eleventh Amendment and *Seminole Tribe.* All of Plaintiffs' Title VI § 602 claim (in Count 6) is also barred in light of *Sandoval* and *Harris.* Furthermore, under *Younger* this Court must abstain from deciding Plaintiffs' substantive due process claim (Count 1), procedural due process claim (Count 2), the claim under the First, Ninth, and Fourteenth Amendments (Count 3) for all Plaintiffs not in extended foster care. Accordingly, Defendants' motions to dismiss are GRANTED on these claims which are DISMISSED with prejudice. However, Counts 1 through 3 survive this order for individuals in extended foster care. Nevertheless, as Plaintiffs failed to comply

with Rule 8, the Amended complaint is DISMISSED without prejudice.

Plaintiffs are directed to file a second amended complaint that is consistent with this order no later than *December 21, 2001.* The second amended complaint should consist of a brief statement of Plaintiffs and their claims and should include the following **three** counts: Count 1 pursuant to § 1983 for alleged violations of constitutional rights of individuals in extended foster care **only;** Count 5 for alleged violations of Early and Periodic Screening, Diagnosis and Treatment statute; and Count 6 for alleged violations of Title VI § 601 dealing with intentional discrimination **only.** Plaintiffs are also required to determine which of the Plaintiffs are no longer suitable to be class representatives because of a lack of standing or mootness under *Prado–Steiman v. Bush,* 221 F.3d 1266 (11th Cir.2000).